[Cite as *In re $75,000.00 U.S. Currency*, 2017-Ohio-9158.]

# Court of Appeals of Ohio

EIGHTH APPELLATE DISTRICT
COUNTY OF CUYAHOGA

JOURNAL ENTRY AND OPINION
No.    105314

# IN RE: $75,000.00 U.S. CURRENCY

[Appeal by Brian Katz]

**JUDGMENT:**
AFFIRMED

Civil Appeal from the
Cuyahoga County Court of Common Pleas
Case No. CV-16-860295

**BEFORE:**    Boyle, J., E.T. Gallagher, P.J., and Blackmon, J.

**RELEASED AND JOURNALIZED:**    December 21, 2017

**ATTORNEY FOR APPELLANT**

James R. Willis
1144 Rockefeller Building
614 West Superior Avenue
Cleveland, Ohio    44113


**ATTORNEYS FOR APPELLEE**

Michael C. O'Malley
Cuyahoga County Prosecutor
BY:    Jennifer Meyer
Assistant County Prosecutor
1200 Ontario Street
Justice Center, 8th Floor
Cleveland, Ohio    44113

MARY J. BOYLE, J.:

{¶1} Claimant-appellant, Brian Katz, appeals the trial court's judgment, ordering the forfeiture of the $75,000 seized from him on March 11, 2016. On appeal, he raises two assignments of error for our review:

> 1. The court erred when it denied the motion to suppress and for the return of illegally seized property.

> 2. Given the state cannot seize money from an individual, with or without probable cause, and require the person from whom it was seized to prove it was lawfully acquired, it follows the court erred when it forfeited this money to the state.

{¶2} Finding no merit to the assignments of error, we affirm.

## I. Procedural History and Factual Background

{¶3} On March 11, 2016, the state filed a complaint for civil forfeiture of the $75,000 found in Katz's vehicle pursuant to R.C. 2981.05. On May 31, 2016, Katz filed a motion to suppress the money found during the traffic stop. At the hearing on both the motion to suppress and forfeiture, the following evidence was presented.

{¶4} In January 2016, Detective Payne with the city of Broadview Heights was assigned to the Cleveland, Ohio high intensity drug trafficking area ("HIDTA"). Along with other HIDTA assigned officers, Detective Payne was conducting surveillance on a number of individuals suspected of drug trafficking who were traveling to and from the Cleveland Hopkins Airport and leaving and entering multiple hotels and residences throughout their stays in Cleveland. During his surveillance, Detective Payne conducted

criminal history checks of the observed individuals and even approached them in the airport and searched their bags after receiving their consent to do so; however, he and the other officers found nothing of evidentiary value in their bags. Detective Payne and HIDTA officers also searched one of the hotel rooms where the individuals stayed, finding drug residue and other materials that Detective Payne testified were commonly used to package and transport drugs.

{¶5} On February 15, 2016, HIDTA officers observed one of the individuals pick up two males at the airport, one being Katz. The individual dropped Katz off at a hotel in Cleveland, where Katz paid cash for a one night's stay. The next day, HIDTA officers observed Katz travel to a Cleveland residence with the same males from the day before. At the residence, Katz entered a 2014 Toyota Camry with California license plates and drove away.

{¶6} HIDTA officers continued to follow Katz and informed a local Ohio State Highway Patrol officer, Lieutenant Hughes, that they suspected Katz to be a drug courier and gave him a description of the vehicle. Lieutenant Hughes subsequently observed Katz's vehicle traveling over the speed limit on Interstate 71. Lieutenant Hughes paced Katz's vehicle at a speed over the speed limit for a short distance and then activated his emergency lights and conducted a traffic stop at approximately 1:39 p.m.

{¶7} After approaching the vehicle and asking for Katz's license and registration, Lieutenant Hughes requested Katz to accompany him to his vehicle and conducted a pat down of Katz's person. While sitting in the police cruiser, Lieutenant

Hughes ran Katz's information. During this time, Katz asked for a break, but did not deny that he was speeding. Approximately five minutes after Lieutenant Hughes stopped Katz and during the time that Lieutenant Hughes was running Katz's information, Officer Andrejack of the Cleveland Police Department and his canine partner arrived at the scene upon request from HIDTA officers. While encircling the vehicle, the canine positively alerted. Subsequent to that alert, Lieutenant Hughes read Katz his *Miranda* warnings and asked him if there were drugs or money in the vehicle. Katz stated, "Not that I know of." Katz was then securely placed in the back of a patrol car.

{¶8} Lieutenant Hughes and other officers began to search the vehicle on the side of Interstate 71; however, due to weather conditions and safety concerns, the officers requested a tow, deciding to conduct the search at the Brookpark State Highway Patrol post instead. Katz was also transported to the post and held in a separate room while the police conducted their search.

{¶9} A search of the vehicle yielded 13 bundles of U.S. currency, totaling $75,000, which was hidden in the vehicle's rear rocker panels.[1] The money was vacuum sealed, covered in brake grease, and then vacuum sealed again.[2] Upon finding the

---

[1] At the hearing and during his testimony, Katz contested the amount of money that was in the vehicle. Katz stated that there was $105,000 in the vehicle in 15 bundles, but that only $75,000 "turned up."

[2] When asked about the packaging of the money at the forfeiture hearing, Katz testified that he coated the money in brake grease "because it deters any odors" and he was "just protecting [his] assets."

money and confirming that he was already *Mirandized* and understood his rights, Detective Payne then interviewed Katz. When Detective Payne asked him about the money, Katz stated that it was "absolutely not" his and denied knowing about the hidden compartments in the vehicle. Katz provided a signed statement to Detective Payne, stating, "I never knew about money found in car. It's not my money. 2014 Camry."

{¶10} Before letting Katz — who was not placed under arrest — leave for the airport, the officers gave Katz a receipt for the money, vehicle, and other property inside the car.[3] As for the speeding violation, Lieutenant Hughes only issued Katz a written warning.

{¶11} At the forfeiture hearing and contrary to his earlier statements to police, Katz claimed that the money belonged to him and was his life savings. Specifically, the following exchange took place at the hearing:

ATTORNEY: [W]ho owned the money?

MR. KATZ: Me.

ATTORNEY: And how long had that money been in that car?

MR. KATZ: In that car for two years.

ATTORNEY: Yes. And what's the source of that money?

MR. KATZ: It's been income I've been earning for the last 25, 30 years.

---

[3] Although the 2014 Toyota Camry was listed on the receipt, the officers released the vehicle to the Toyota leasing company, based on the alterations made to the vehicle — specifically, the hidden compartments — which violated the terms of Katz's lease agreement.

ATTORNEY:          Your life savings?

MR. KATZ:          Yes. I lost a lot of money in 2008, in the crash, because I had most of my funds in the stock market[.] * * * So I decided to keep my money, to hide it, and I paid taxes on the money anyway, because it was income.   So it was my hard-earned money for 44 years[.]

Further, when asked why he initially denied knowledge and ownership of the money, Katz explained that he believed he would be arrested for a hidden-compartments violation if he claimed the money.

{¶12} In its opinion and judgment entry, the trial court denied Katz's motion to suppress, finding that the traffic stop was constitutional because Katz was speeding, the traffic stop was not unlawfully prolonged, the police had probable cause to search the vehicle because the canine alerted, and the police's removal of the vehicle to the patrol post was lawful.

{¶13} Additionally, the trial court  found that Katz failed to establish his ownership of the funds.   Nevertheless, the trial court considered the merits of the forfeiture action and additionally found that the state proved by a preponderance of the evidence that the money was subject to forfeiture.   Specifically, the court stated that it was:

more probable than not * * * that $75,000 in currency, wrapped in plastic, coated with brake grease to avoid scent detection, then vacuum sealed and placed in [a] hidden compartment in a vehicle, is either proceeds derived from or acquired through the commission of an offense or an

instrumentality that was used in or intended to be used in the commission or facilitation of a felony.[4]

**{¶14}** It is from this judgment that Katz appeals.

## II. Law and Analysis

### A. Motion to Suppress

**{¶15}** In his first assignment of error, Katz argues that the trial court improperly denied his motion to suppress the money seized from his vehicle during the March 11, 2016 traffic stop because the officers' claim of a traffic violation was pretext, the drug dog did not actually alert to drugs, the officers unconstitutionally delayed their search, the officers lacked a search warrant, and the officers took statements from Katz in violation of his constitutional rights.

#### *Standard of Review*

> Appellate review of a motion to suppress presents a mixed question of law and fact. When considering a motion to suppress, the trial court assumes the role of trier of fact and is therefore in the best position to resolve factual questions and evaluate the credibility of witnesses. Consequently, an appellate court must accept the trial court's findings of fact if they are supported by competent, credible evidence. Accepting these facts as true, the appellate court must then independently determine, without deference to the conclusion of the trial court, whether the facts satisfy the applicable legal standard.

(Citations omitted.) *State v. Burnside*, 100 Ohio St.3d 152, 2003-Ohio-5372, 797 N.E.2d 71, ¶ 8.

#### *The Exclusionary Rule in Forfeiture Cases*

---

[4] We will discuss more specific facts related to the appellant's assignments of error and the trial court's opinion more fully in the body of this opinion.

**{¶16}** In support of his motion to suppress, Katz argues that the exclusionary rule applies to civil forfeiture actions, citing *One 1958 Plymouth Sedan v. Pennsylvania*, 380 U.S. 693, 85 S.Ct.1246, 14 L.Ed.2d 170 (1965). The state argues that the exclusionary rule does not apply in civil actions, citing *State ex rel. Roszmann v. Lions Den*, 89 Ohio App.3d 775, 627 N.E.2d 629 (12th Dist.1993). We agree with Katz.

**{¶17}** The Fourth Amendment to the United States Constitution protects individuals from unreasonable searches and seizures. The exclusionary rule, which upholds the rights guaranteed by the Fourth Amendment, applies to forfeiture proceedings because they are quasi-criminal in nature, penalizing individuals by depriving them of their property. *One 1958 Plymouth Sedan* at 701-702; *see also State v. Recinos*, 5th Dist. Richland No. 14CA9, 2014-Ohio-3021, ¶ 24, citing *State v. Roberts*, 102 Ohio App.3d 514, 657 N.E.2d 547 (9th Dist.1995) (holding that forfeiture actions are "instituted as a criminal penalty").

**{¶18}** The state's case, *Roszmann*, is unpersuasive for several reasons. In that case, the Twelfth District Court of Appeals, reviewing a nuisance action filed by the state against a local adult arcade, stated, "'[G]enerally, the exclusionary rule has not been applied in civil cases; we see no reason to expand the exclusionary rule to the facts of this case.'" *Id.* at 786, quoting *State ex rel. Rear Door Bookstore v. Tenth Dist. Court of Appeals*, 63 Ohio St.3d 354, 588 N.E.2d 116 (1992). If we were to adopt the state's position, that adoption would directly conflict with the United States Supreme Court's decision in *One 1958 Plymouth Sedan.* Further, the Twelfth District's use of

"generally" shows that the exclusionary rule is sometimes applied in civil cases, such as forfeiture actions. *Roszmann* is distinguishable in that it — as well as the case it cites to, *Rear Door* — concerned a nuisance action, which, unlike forfeiture actions, is not recognized as a "quasi-criminal" proceeding in Ohio. *See Hamilton v. Ebbing*, 12th Dist. Butler No. CA2011-01-001, 2012-Ohio-2250, ¶ 25 (rejecting the appellant's argument that a nuisance abatement action was a "quasi-criminal" action).

{¶19} Further, as the trial court pointed out, since the Supreme Court's holding in *One 1958 Plymouth Sedan*, Ohio courts have held that the exclusionary rule applies to forfeiture proceedings. *See State v. Crumpler,* 9th Dist. Summit Nos. 26098 and 26118, 2012-Ohio-2601, ¶ 23; *State v. McShepard*, 9th Dist. Summit No. 07CA009118, 2007-Ohio-6006, ¶ 13; *Ohio Dept. of Liquor Control v. FOE Aerie 0456*, 99 Ohio App.3d 380, 386, 650 N.E.2d 940 (10th Dist.1994); *State v. Bailey*, 64 Ohio App.3d 379, 382, 581 N.E.2d 1104 (6th Dist.1989). Therefore, the state's position is not well taken, and we find that Katz's motion to suppress is properly before this court and review Katz's assignment of error concerning his claim involving the exclusionary rule.

### *The Traffic Stop*

{¶20} In his initial argument concerning his first assignment of error, Katz argues that Lieutenant Hughes's traffic stop violated his Fourth Amendment protection against unreasonable seizures.

{¶21} "'A traffic stop must comply with the Fourth Amendment's general reasonableness requirement.'" *State v. Fontaine*, 8th Dist. Cuyahoga No. 99771,

2013-Ohio-5257, ¶ 13, quoting *State v. Aquirre*, 4th Dist. Gallia No. 03CA5, 2003-Ohio-4909. "[A] law enforcement officer may briefly stop and detain an individual for investigative purposes if he has a reasonable suspicion supported by articulable facts that 'criminal activity may be afoot.'" *Brassfield* at ¶ 34, quoting *Terry v. Ohio*, 392 U.S. 1, 88 S.Ct. 1868, 20 L.Ed.2d 889 (1968). A traffic stop is unreasonable if it is not supported by the requisite suspicion. *Dayton v. Erickson*, 76 Ohio St.3d 3, 9, 665 N.E.2d 1091 (1996)*; State v. Caldwell*, 5th Dist. Richland No. 2011-CA-0024, 2011-Ohio-5429, ¶ 19.

{¶22} A traffic stop is reasonable if a police officer has probable cause to believe that a traffic violation occurred or was occurring. *Erickson* at syllabus, citing *United States v. Ferguson*, 8 F.3d 385 (6th Cir.1993). "It is well settled that a traffic stop is lawful even if the traffic violations are minor, or 'de minimis[,]'" such as a speeding violation. *State v. White*, 8th Dist. Cuyahoga No. 100624, 2014-Ohio-4202, ¶ 14; *State v. Brassfield,* 8th Dist. Cuyahoga No. 83331, 2004-Ohio-2412, ¶ 37. An officer's ulterior motive for stopping the vehicle does not deprive the traffic stop of its constitutionality. *White* at ¶ 15, citing *Erickson; see also State v. Mitchell*, 8th Dist. Cuyahoga No. 94917, 2011-Ohio-477, ¶ 8 (holding that "the officers had authority to stop appellant based on the loud music violation regardless of whether they were using that violation as a pretext to investigate further.").

{¶23} Here, Lieutenant Hughes testified that Katz was speeding, a fact that Katz did not entirely deny during his own testimony. In response to a question of whether he

knew how fast he was driving, Katz testified that he did not believe he was speeding because he was going with the flow of traffic. While Katz now argues that he never admitted to speeding, we defer to the trial court's credibility determinations and, here, the trial court found Lieutenant Hughes to be credible. *State v. Eason*, 8th Dist. Cuyahoga No. 103575, 2016-Ohio-5516, ¶ 47. Therefore, we defer to the trial court's finding that a traffic violation did occur and hold that, alone, allowed Lieutenant Hughes to conduct a traffic stop.

{¶24} Further, even though Katz argues that Lieutenant Hughes's ultimate purpose for the stop was to search for money, rather than to enforce the speed limit, that unproven and ulterior motive has no bearing on the traffic stop's constitutionality.

### *Length of the Traffic Stop*

{¶25} Next, Katz argues that the police unconstitutionally prolonged the traffic stop to effectuate a canine sniff of his vehicle. The state argues that the canine sniff occurred within the time needed to issue a traffic citation, and therefore, did not unconstitutionally prolong the traffic stop.

{¶26} "'When conducting the stop of a motor vehicle for a traffic violation, an officer may detain the vehicle for a time sufficient to investigate the reason for which the vehicle was initially stopped.'" *White*, 8th Dist. Cuyahoga No. 100624, 2014-Ohio-4202, at ¶ 17, quoting *State v. Bennett*, 8th Cuyahoga No. 86962, 2006-Ohio-4274. An "officer must limit both the scope and duration of the stop to the matter at hand, namely, writing the citation, and any expanded investigation unrelated to

the traffic violation must be based upon reasonable articulable suspicion." *White* at ¶ 17*,* citing *State v. Duran*, 9th Dist. Lorain No. 11CA009969, 2012-Ohio-2114; *see also Rodriguez v. United States*, 575 U.S. ___, 135 S.Ct. 1609, 191 L.Ed.2d 492 (2015) (during a stop for a traffic violation, an officer's duties typically "involve checking the driver's license, determining whether there are outstanding warrants against the driver, and inspecting the automobile's registration and proof of insurance.").

{¶27} When determining whether there is a Fourth Amendment issue with the length of a traffic stop, courts examine the totality of the circumstances and must ask "'at what point in time did the purpose of the traffic stop end and the detention of the driver and the vehicle's occupants begin?'" *Fontaine*, 8th Dist. Cuyahoga No. 99771, 2013-Ohio-5257, at ¶ 16, quoting *United States v. Bonilla*, 357 Fed. Appx. 693 (6th Cir.2009); *State v. Batchili*, 113 Ohio St.3d 403, 2007-Ohio-2204, 865 N.E.2d 1282, ¶ 12; *Fontaine* at ¶ 18. Ohio courts have held that the longest a traffic stop and citation issuance should take is approximately 15 minutes. *See State v. Armstrong*, 8th Dist. Cuyahoga No. 103088, 2016-Ohio-2627, ¶ 25; *White* at ¶ 22; *State v. Brown*, 183 Ohio App.3d 337, 2009-Ohio-3804, 916 N.E.2d 1138, ¶ 23 (6th Dist.).

{¶28} Police may conduct a canine sniff during the time that it takes to issue a traffic citation "so long as the duration of the traffic stop is not extended beyond what is reasonably necessary to resolve the issue that led to the stop and issue a traffic citation." *State v. Vega*, 8th Dist. Cuyahoga No. 104058, 2017-Ohio-651, ¶ 15, quoting *State v. Greene*, 2d Dist. Montgomery No. 25577, 2013-Ohio-4516. Police may conduct a

canine sniff during a traffic stop "[e]ven without a reasonable suspicion of drug-related activity." *State v. Jones,* 8th Dist. Cuyahoga No. 100300, 2014-Ohio-2763, ¶ 23, citing *State v. Jones*, 4th Dist. Washington No. 03CA61, 2004-Ohio-7280; *State v. Neal*, 10th Dist. Franklin No. 15AP-771, 2016-Ohio-1406, ¶ 13. But "a detention justified by issuing a ticket to the driver can become unlawful if it is prolonged beyond the time reasonably required to complete that process[,]" such as when police continue to detain the driver to effectuate a canine sniff of the vehicle. *Armstrong* at ¶ 25.

{¶29} Here, Lieutenant Hughes testified that approximately five minutes after he initiated the traffic stop, Officer Andrejack and his canine arrived and sniffed the exterior of the car. Officer Andrejack completed the canine sniff while Lieutenant Hughes was still checking Katz's vehicle registration and license. The timing of the canine sniff was well within the usual 15-minute timespan typically needed to complete a traffic citation. Katz has offered no evidence or clear argument refuting the timing of the canine sniff, and "[i]n the absence of some evidence that the normal procedures were delayed for reasons unrelated to the investigation of the traffic violation, the only reasonable conclusion to draw from the evidence is that the length of appellant's detention was no longer than necessary." *State v. Neal*, 10th Dist. Franklin No. 15AP-771, 2016-Ohio-1406, ¶ 23. Therefore, the evidence shows that Katz's detention was not prolonged by the canine sniff and does not require the suppression of the seized money.

**_The Search of the Vehicle_**

**{¶30}** In his brief, Katz argues that the canine "allegedly" alerted and even if the canine alerted, the officers still needed a warrant to search the vehicle.

**{¶31}** Contrary to Katz's argument, it is well established in Ohio and this district that

> [u]nder the "automobile exception," the police may search an automobile without a warrant, as long as the police have probable cause to believe the vehicle contains evidence of criminal activity. The courts, including this court, have held that once a trained drug dog alerts to the odor of drugs from a lawfully detained vehicle, * * * there is probable cause to justify a warrantless search of the vehicle for contraband.

*White,* 8th Dist. Cuyahoga No. 100624, 2014-Ohio-4202, at ¶ 23, citing *State v. Davis*, 8th Dist. Cuyahoga No. 87964, 2007-Ohio-408; *see also Jones* at ¶ 23, citing *Davis* ("Once a trained drug dog alerts to the odor of drugs from a lawfully detained vehicle, there is probable cause to search the vehicle for contraband."). "If probable cause justifies the search of a lawfully stopped vehicle, it justifies the search of every part of the vehicle and its contents that may conceal the object of the search." *United States v. Ross*, 456 U.S. 798, 825, 102 S.Ct. 2157, 72 L.Ed.2d 572 (1982).

**{¶32}** Here, Lieutenant Hughes, Officer Andrejack, and even Katz testified that the canine alerted during the traffic stop. Therefore, the police had probable cause to search the vehicle for contraband and did not need a warrant.

### *Delay in Search*

**{¶33}** Also in support of his first assignment of error, Katz argues that the police unlawfully delayed the search when they transported both him and his vehicle to the Brookpark State Highway Patrol post.

**{¶34}** "The United States Supreme Court has held that there is no prohibition in moving a car to the station in order to conduct a probable cause search under more practical, and perhaps safer, conditions." *State v. Brooks*, 3d Dist. Hancock No. 5-11-11, 2012-Ohio-5235, ¶ 33, citing *Chambers v. Maroney*, 399 U.S. 42, 90 S.Ct. 1975, 26 L.Ed.2d 419 (1970). Relocating a vehicle promotes the safety of officers, stopped pedestrians, and travelers.[5]

**{¶35}** "The test to be applied where the vehicle is moved * * * is whether, under the circumstances, the act of moving the vehicle to the station house was 'reasonable.'" *State v. Jones,* 1st Dist. Hamilton No. C-75272, 1976 Ohio App. LEXIS 8496, *11 (Apr. 12, 1976), citing *Chambers*. Therefore, the location to which the vehicle is moved, as well as the time it takes to move the vehicle to that location, must be reasonable.

**{¶36}** Ohio courts have held that police do not lose probable cause when they reasonably move a vehicle to a safer location to conduct a search. *State v. Williams*, 4th

---

[5] According to the Emergency Responder Safety Institute, a national advisory group of public safety and transportation experts, an average of 6 to 8 rescue and EMS workers and 10 to 12 police officers are killed while working in or near moving traffic every year. Emergency Management, *"Move Over" Laws Aim to Save Emergency Responders' Lives on Highways*, http://www.govtech.com/em/safety/ Move-Over-Laws-Aim-Save-Lives-Highways.html (accessed Nov. 8, 2017). Further, according to the National Law Enforcement Officers Memorial Fund, in 2015, 11 officers were struck and killed by traffic. National Law Enforcement Officers Memorial Fund, *Preliminary 2015 Law Enforcement Officer Fatalities Report*, http://www.nleomf.org/assets/pdfs/reports/2015-EOY-Officer-Fatalities-Report.pdf (accessed Nov. 8, 2017). *See also* Washington's Top News, *Highways are Dangerous for Police Officers, Road Crews*, https://wtop.com/maryland/2016/04/ highways-are-dangerous-for-police-officers-road-crews/ (accessed Nov. 8, 2017); Move Over Laws.com, http://www.moveoverlaws.com/ (accessed Nov. 8, 2017) ("According to FBI statistics, law enforcement officers being struck and killed is a major cause of law enforcement deaths[,]" and "Police put their lives in danger each time they leave their patrol

Dist. Highland No. 12CA7, 2013-Ohio-594, ¶ 27 (finding that the police were allowed to conduct their search at another location because the conditions alongside the road "were not optimal"); *Brooks* at ¶ 34 (finding that moving the vehicle to another location, even after the officers had been searching for 30 minutes, was permissible for officer safety concerns and easier accessibility); *State v. Bolding*, 6th Dist. Erie No. E-97-115, 1999 Ohio App. LEXIS 2383, *22-23 (May 28, 1999) (finding that moving the vehicle was reasonable because of the better lighting and safer conditions for the troopers); *State v. Carpenter*, 9th Dist. Medina No. 2667-M, 1998 Ohio App. LEXIS 1467, *10 (Apr. 8, 1998) (upholding the officers' decision to move the vehicle to their patrol post to gain assistance in opening the vehicle's trunk); *Jones* at *11 (upholding the relocation of the vehicle to the station house because of the "hazardous" conditions).

{¶37} Here, the evidence shows that the conditions on Interstate 71 were dangerous due to the weather and location of the stop. When asked why the officers moved the vehicle to the trooper post, Officer Payne testified that "[i]t was pretty cold and snowy, rainy that day, it was on the side of the highway, so I presume they wanted to take it back there to be able to search it in a little bit safer of a place." Lieutenant Hughes testified that one trooper "had flagged a car over to tell it to move over because it was in the right-hand lane, and in a controlled environment we can conduct a search more safely and thoroughly as opposed to on the side of the road a few feet from traffic on the

cars parked along a busy freeway.").

interstate." The dash cam video from Lieutenant Hughes's police car confirms the officers' testimony citing the hazardous conditions.

**{¶38}** At oral argument, Katz set forth a "slippery-slope" argument, contending that should the officer's removal of his vehicle stand, officers will have free range to relocate any vehicle that is the subject of a traffic stop. That argument has no merit based on the cases previously discussed. Once again, the removal of a vehicle from the side of the road to a safer location must be reasonable, which is a determination that will be made on a case-by-case basis. For example, in cases where road conditions are safe, visibility is optimal, and officer safety is not in jeopardy, removal of a vehicle to another location may not be reasonable. But, as stated above, the conditions in this case establish that removing the vehicle from the side of the road to conduct a search was reasonable.

**{¶39}** Further, the probable cause to search the vehicle established by the canine's alert did not dissipate during the time that it took to tow the vehicle to the patrol post. Therefore, the officers still had probable cause to search Katz's vehicle. *See Texas v. White*, 423 U.S. 67, 68, 96 S.Ct. 304, 46 L.Ed.2d 209 (1975) (discussing *Chambers* and concluding that the probable cause factor still existed when the vehicle was relocated to the station house); *Bolding*, 6th Dist. Erie No. E-97-115, 1999 Ohio App. LEXIS 2383, at *22-23, citing *Chambers* ("Since the facts of the case support a warrantless search of the vehicle at the stop, they also support[ed] a search after the vehicle [was] moved to the

patrol station."). Therefore, Katz's argument concerning the reasonableness of the relocation and delay in searching the vehicle is unconvincing.

{¶40} Finally, in his brief, Katz cites to *Missouri v. McNeely*, 569 U.S. 141, 133 S.Ct. 1552, 185 L.Ed.2d 696 (2013), to support his argument that the police's delay in searching the vehicle and obtaining a search warrant was excessive. After a thorough reading of *McNeely*, however, we find it uninformative. *McNeely* concerned the taking of a blood sample from a suspected intoxicated driver without a warrant, which the state argued was not needed based on the exigency exception to the warrant requirement. In that case, the United States Supreme Court stated that "technological developments that enable police officers to secure warrants more quickly, and do so without undermining the neutral magistrate judge's essential role as a check on police discretion, are relevant to an assessment of exigency." *Id.* at 1562. This case, however, concerns the search of a car after a positive alert by a canine. As already discussed, the officers here did not need a warrant after establishing probable cause through that canine alert, and they were able to search the car without a warrant under the automobile exception to the warrant requirement, not the exigency exception. Moreover, *McNeely* sets forth no rule of law concerning the relocation of a stopped vehicle to effectuate a search.

### *Katz's Statements*

{¶41} Finally, Katz vaguely argues that his statements denying ownership of the seized money should be suppressed because they were taken in violation of his right to counsel.

**{¶42}** Here, the trial court found that "[t]he only evidence of [the] request [for counsel] is Katz's testimony, which is controverted by two taped interactions where Katz was advised of his rights, acknowledged understanding his rights, and proceeded to talk with law enforcement officers without mentioning an attorney." Once again, because the trial court is the trier of fact and weighs the credibility of the evidence, we must defer to its factual and credibility findings if supported by competent, credible evidence. *State v. Robinson*, 8th Dist. Cuyahoga No. 90731, 2008-Ohio-5580, ¶ 44, citing *State v. DePew*, 38 Ohio St.3d 275, 528 N.E.2d 542 (1988), and *State v. Polk*, 8th Dist. Cuyahoga No. 84361, 2005-Ohio-774. Therefore, in light of the trial court's determination concerning Katz's credibility and a review of the supporting evidence, we find that the statements were not taken in violation of Katz's right to counsel and were properly admitted.

**{¶43}** In sum, the trial court's denial of Katz's motion to suppress was proper as to both the seized money and Katz's statements to police. Accordingly, Katz's first assignment of error is overruled.

### B. Forfeiture

**{¶44}** In his second assignment of error, Katz argues that the trial court erred in ordering the forfeiture of the seized money because the state failed to show that it was related to a criminal offense. In response, the state argues that it proved, by a preponderance of the evidence, that the money was subject to forfeiture, and the trial court's ruling was proper.

**{¶45}** Before addressing the merits of his second assignment of error, we must first determine if Katz has standing to challenge the forfeiture action. Even though the issue was not clearly raised or addressed in either party's appellate briefs, "the issue of standing is jurisdictional and may be raised by the court sua sponte." *State v. Langston*, 6th Dist. Lucas No. L-12-1014, 2012-Ohio-6249, ¶ 7, citing *In re Foreclosure of Parcel of Land Encumbered with Delinquent Tax Liens*, 11th Dist. Lake No. 2007-L-002, 2007-Ohio-4377, and *In re Forfeiture of John Deere Tractor*, 4th Dist. Athens No. 05CA26, 2006-Ohio-388. Standing is a question of law for us to review de novo. *State v. Jamison*, 2d Dist. Montgomery No. 23211, 2010-Ohio-965, ¶ 10.

**{¶46}** Under the forfeiture statutes, only "a person with an interest in the property subject to forfeiture" has standing to challenge an action by the state. *In re $449 United States Currency*, 1st Dist. Hamilton No. C-110176, 2012-Ohio-1701, ¶ 21, citing R.C. 2981.05(C). Therefore, a party with no interest in the seized property lacks the standing required to appeal the forfeiture. *Id.*

**{¶47}** In its opinion and judgment entry, the trial court stated:

Mr. Katz consistently disclaimed that he owned or even knew of the money at the time of the traffic stop and the subsequent seizure. While he now maintains the currency is his, he did not know where the money was or how much money was seized at the time of the search. His testimony in Court offered no competent or credible evidence establishing his ownership of the

money. As set forth above, his explanation for how and why the money was found sealed in hidden compartments in his vehicle lacked credibility. Mr. Katz failed to present any corroborating evidence to establish his ownership of the funds.

While it is not entirely clear if the trial court found that Katz lacked standing, especially considering that it decided the case on the merits, we find that, based on case law, Katz's in-court assertion of an ownership interest is enough to establish standing. In *Langston*, the court found that the appellant lacked standing to challenge the state's forfeiture action because he did not claim "an interest in any of the seized currency; nor did he claim such an interest during the proceedings in the trial court." *Id.* at ¶ 10. In *Crumpler*, 9th Dist. Summit Nos. 26098 and 26118, 2012-Ohio-2601, the court found that the claimant lacked standing to demand the return of jewelry because "she testified at the hearing that she did not own that jewelry." *Id*. at ¶ 20. Further, in *Jamison*, the court found that the claimant lacked standing because he failed to make his claim of ownership "in the trial court." *Id*. at ¶ 32.

{¶48} Based on the above case law, testimony alleging an ownership interest is enough to establish standing. Here, Katz initially denied that he knew about or owned the money; however, unlike the parties in the above-cited cases, Katz testified at the hearing that the money was actually his life savings. Incredible or not, that testimony is enough to establish an interest in the money according to the above case law. Therefore, we find that Katz had standing to challenge the civil forfeiture action.

*Forfeiture*

**{¶49}** We now turn to the merits of Katz's second assignment of error.

**{¶50}** "On review, an appellate court may not reverse the trial court's [forfeiture order] where there is 'some competent, credible evidence going to all the essential elements of the case.'" *State v. Fort*, 8th Dist. Cuyahoga No. 100346, 2014-Ohio-3412, ¶ 17, quoting *State v. Watkins*, 7th Dist. Mahoning No. 07 JE 54, 2008-Ohio-6634; *see also Watkins* at ¶ 34, quoting *State v. Balwanz*, 7th Dist. Belmont No. 02-BE-37, 2004-Ohio-1534 ("When reviewing a judgment based on a preponderance of the evidence, an appellate court should not reverse the judgment if there is 'some competent, credible evidence going to all the essential elements of the case.'"). "The scope of our review in this case is limited to an examination of the evidence presented to see if the evidence supports the finding that the items seized were an instrumentality or proceeds of a conduct that would constitute a felony drug offense." *State v. $765.00 in United States Currency*, 181 Ohio App.3d 162, 2009-Ohio-711, 908 N.E.2d 486, ¶ 26 (5th Dist.). Further, "we defer to the trial court's determination of witness credibility in a civil forfeiture action." *State v. Baas*, 10th Dist. Franklin No. 13AP-644, 2014-Ohio-1191, ¶ 29; *see also Marmet Drug Task Force v. Paz*, 3d Dist. Marion No. 9-11-60, 2012-Ohio-4882, ¶ 25, citing *Seasons Coal Co. v. Cleveland*, 10 Ohio St.3d 77, 461 N.E.2d 1273 (1984) ("Mere disagreement over the credibility of witnesses or evidence is not sufficient reason to reverse a judgment.").

**{¶51}** "In general, forfeiture is disfavored in Ohio." *Fort* at ¶ 17. "As a consequence, such statutes must be strictly construed against the state." *State v. Golston*, 66 Ohio App.3d 423, 429, 584 N.E.2d 1336 (8th Dist.1990). The procedures that the state must follow when seeking forfeiture of an individual's property are codified in Chapter 2981 of the Ohio Revised Code. R.C. 2981.05 allows the state to seek forfeiture through civil actions. To succeed, the state must establish that the seized property is subject to forfeiture under R.C. 2981.02 by a preponderance of the evidence.[6] R.C. 2981.05(D); *see Fort* at ¶ 17.

**{¶52}** "Proceeds derived from or acquired through the commission of an offense" and instrumentalities "used in or intended to be used in the commission or facilitation of" a felony are subject to forfeiture. R.C. 2981.02. R.C. 2981.01(B) defines "proceeds" as "any property derived directly or indirectly from an offense," which "may include * * * money or any other means of exchange[.]"

---

[6] In 2016, the General Assembly amended R.C. 2981.05, changing the burden of proof required in civil forfeiture proceedings to clear and convincing evidence. The statute now reads:

> [T]he state may file a civil forfeiture action, in the form of a civil action, against any person who is alleged to have received, retained, possessed, or disposed of proceeds, in an amount exceeding fifteen thousand dollars, knowing or having reasonable cause to believe that the proceeds were allegedly derived from the commission of an offense subject to forfeiture proceedings in violation of section 2927.21 of the Revised Code. * * * The court shall issue a civil forfeiture order if it determines that the prosecutor has proved by clear and convincing evidence that the property is subject to forfeiture under section 2981.02 of the Revised Code, and, after a proportionality review under section 2981.09 of the Revised Code when relevant, the trier of fact specifically describes the extent of the property to be forfeited.

**{¶53}** Further, R.C. 2981.01(B)(10) defines "offense" as "any act or omission that could be charged as a criminal offense * * * whether or not a formal criminal prosecution * * * began at the time the forfeiture is initiated" and "an offense for which property may be forfeited includes any felony and any misdemeanor." In other words, "it is immaterial to civil forfeiture proceedings whether the defendant is also charged or convicted of an underlying criminal offense." *Marmet* at ¶ 23, citing R.C. 2981.01(B)(10). "[T]rial courts are not limited to considering only the underlying criminal offense when deciding a forfeiture action, and may pursue property derived from any act that would constitute a felony drug offense, regardless of a defendant's conviction or acquittal on such an offense." *State v. Brownridge*, 3d Dist. Marion No. 9-09-24, 2010-Ohio-104, ¶ 25, citing *Watkins*, 7th Dist. Mahoning No. 07 JE 54, 2008-Ohio-6634; *see also Dayton Police Dept. v. Thompson*, 2d Dist. Montgomery No. 24790, 2012-Ohio-2660, ¶ 12 ("Contrary to Thompson's argument, the government was required to prove that the money in his pocket constituted proceeds of 'an offense,' not necessarily proceeds of the offense at issue in his criminal case."); *State v. Parks*, 8th Dist. Cuyahoga No. 90368, 2008-Ohio-4245, ¶ 26 (holding that an "acquittal does not mean that forfeiture of items cannot be ordered."). "A conviction is not required." *Thompson* at ¶ 23.

**{¶54}** The state's burden in civil forfeiture actions, a preponderance of the evidence, is "relatively low." *State v. Bustamante*, 3d Dist. Seneca Nos. 13-12-26 and 13-13-04, 2013-Ohio-4975, ¶ 40. Nevertheless, because the "'[m]ere possession of cash

is not unlawful[,]'" the state must point to other factors demonstrating that it "'is more probable than not, from all the[] circumstances, that the defendant used the money in the commission of a criminal offense.'" *Parks* at ¶ 29, quoting *State v. Blackshaw*, 8th Dist. Cuyahoga No. 70829, 1997 Ohio App. LEXIS 2362 (May 29, 1997). Some of those factors include whether the money was in small denominations, whether drugs or drug paraphernalia were found with the money, where the money was found, the amount of money found, how the money was packaged, the possessor's employment status, the owner's explanation for the cash, and if the money was marked and given to the possessor by an informant. *See Fort,* 8th Dist. Cuyahoga No. 100346, 2014-Ohio-3412, at ¶ 23; *State v. Crumpler*, 9th Dist. Summit No. 26763, 2014-Ohio-3211, ¶ 8; *Bustamante* at ¶ 40; *Marmet* at ¶ 28-34; *Harris v. Mayfield Hts.*, 8th Dist. Cuyahoga No. 95601, 2011-Ohio-1943, ¶ 19-22; *Brownridge* at ¶ 27; *Watkins* at ¶ 36-41; *Parks* at ¶ 29; *State v. Harris*, 12th Dist. Butler No. CA2007-04-089, 2008-Ohio-3380, ¶ 28.

{¶55} While some Ohio courts have also looked to whether a drug dog alerted to the money, we have found that factor as "insufficient to support an inference of criminal activity." *Compare State v. Harris* at ¶ 28 *with Harris v. Mayfield Hts.* at ¶ 19. In *Harris v. Mayfield Hts.*, we discussed two federal circuit court of appeals cases: *United States v. $5,000 in U.S. Currency*, 40 F.3d 846 (6th Cir.1994), and *United States v. $639,558.00 in United States Currency*, 955 F.2d 712 (D.C.Cir.1992). In those cases, the courts relied on evidence showing that most U.S. currency is tainted with traces of drugs. In *$639,558.00*, "the court cited the testimony of an expert, * * * who testified

that 90% of all cash in the United States contains sufficient quantities of cocaine to alert a trained dog." *Harris* at ¶ 20. Based on that case law, we refused to consider a drug dog's alert as an indication that money is connected to drug trafficking activity.

**{¶56}** Here, in its opinion and judgment entry, the trial court stated:

The evidence before the Court demonstrates that this was not merely cash in the passenger compartment or even in the vehicle's trunk. Nor was the amount of cash such that it could be reasonably explained under ordinary circumstances. Rather, it was $75,000 in 1-3 packets, (wrapped in plastic, coated with brake grease to mask its odor, and wrapped again in plastic) secreted within two hidden compartments in the vehicle.

The amount of currency, its manner of packaging, and the efforts at deception in both packaging and storage are compelling evidence that the money was used for or derived from illegal activities.

The attendant circumstances of Mr. Katz's activities bolster this conclusion. As Det. Payne recounted, substantial activity associated with drug trafficking was occurring around Mr. Katz [sic] disclaimed all knowledge of the compartments or the currency at the time of the search.

Standing alone, this pattern of conduct strongly indicates drug trafficking. The Court cannot hypothesize a reasonable explanation for creating hidden compartments in a vehicle to store cash or to package the cash to avoid detection by law enforcement. Additionally, the creation of hidden compartments in a leased vehicle is even more suspect since such material alteration voids the terms of the lease.

If there were a reasonable explanation for hiding substantial sums of money in hidden compartments in one's car, Mr. Katz had ample opportunity to establish it as well as to establish his claim to the money. He did neither. Mr. Katz offered conflicting versions of why he was in Cleveland and how he arrived here. First, he told officers he drove here frequently, then he told them he flew in to pick up his car to drive to an auto-auction, and finally it was to retrieve his car that had been damaged during his last visit to a friend in Amherst even though he frequently disclaimed that any body work had been done on the car.

Additionally, the explanation that the vehicle was used as a "car-bank" is incredible. No reasonable person, living in the State with one of the highest theft rates (https://vvww.nicb.org/newsroom/news-releases/20l5-hot~spots-vehicle-the ft-report), driving one of the most frequently stolen vehicles (NICB's Hot Wheels: America's 10 Most Stolen Vehicles, https://www.nicb.org/newsroom/news-releases), would seal his life savings in an easily destructible object, much less leave that vehicle with a stranger to perform body work for a period of weeks.

In concluding its opinion, the trial court found "that it is more probable than not, * * * that $75,000 in currency, wrapped in plastic, coated with brake grease to avoid scent detection, then vacuum sealed and placed in hidden compartment [sic] in a vehicle, is either proceeds * * * or an instrumentality * * * intended to facilitate drug trafficking."

{¶57} To summarize, the trial court found that the state met its burden based on (1) the amount of the money found, (2) the way the money was wrapped and hidden, (3) the prior activity of Katz's acquaintances observed by HIDTA officers, (4) Katz's inconsistent explanations for being in Cleveland, and (5) Katz's lack of a credible explanation for the money.

{¶58} Here, the trial court's conclusion is supported by evidence presented at the forfeiture hearing and delineated in its judgment entry and opinion. The significant amount, location, and packaging of the money found in Katz's vehicle was more indicative of drug trafficking than that in *Marmet.* While no drugs were ultimately found on Katz or in his vehicle, the surrounding circumstances and observations made by HIDTA officers also strongly indicate a nexus between the money and drug trafficking

activity.     Accordingly, we find that the trial court's order for forfeiture is supported by competent, credible evidence.

**{¶59}** Judgment affirmed.

It is ordered that appellee recover from appellant costs herein taxed.

The court finds there were reasonable grounds for this appeal.

It is ordered that a special mandate be sent to said court to carry this judgment into execution.

A certified copy of this entry shall constitute the mandate pursuant to Rule 27 of the Rules of Appellate Procedure.

_____

MARY J. BOYLE, JUDGE

EILEEN T. GALLAGHER, P.J., and
PATRICIA ANN BLACKMON, J., CONCUR