[Cite as *State v. Byrd*, 2022-Ohio-4635.]

# COURT OF APPEALS OF OHIO

## EIGHTH APPELLATE DISTRICT
## COUNTY OF CUYAHOGA

STATE OF OHIO,                                    :

    Plaintiff-Appellee,               :

                                                              No. 111330

    v.                                                    :

TYRA BYRD,                                          :

    Defendant-Appellant.          :

---

JOURNAL ENTRY AND OPINION

**JUDGMENT:** JUDGMENT REVERSED AND CONVICTION
VACATED; REMANDED
**RELEASED AND JOURNALIZED:** December 22, 2022

---

Criminal Appeal from the Cuyahoga County Court of Common Pleas
Case No. CR-21-657035-A

---

## *Appearances:*

Michael C. O'Malley, Cuyahoga County Prosecuting
Attorney, and Alicia Harrison, Assistant Prosecuting
Attorney, *for appellee.*

Cullen Sweeney, Cuyahoga County Public Defender, and
Aaron T. Baker, Assistant Public Defender, *for appellant*.

MICHELLE J. SHEEHAN, P.J.:

{¶ 1} Defendant-appellant Tyra Byrd appeals from a judgment of the trial court convicting her of improperly handling firearms in a motor vehicle and carrying

a concealed weapon. Byrd's vehicle was stopped by a police officer for a marked lanes violation. During the traffic stop, a gun was found in Byrd's fanny pack. On appeal, Byrd argues the trial court erred in denying her motion to suppress. Specifically, she argues the officer unlawfully stopped her vehicle and improperly prolonged the traffic stop to effectuate a canine sniff of her vehicle. Upon review, we conclude that the traffic stop initiated by the police officer was valid pursuant to the existing case-law authority. However, the officer unlawfully prolonged the traffic stop for a canine sniff of her vehicle without a reasonable suspicion to justify conducting a canine sniff, in violation of Byrd's Fourth Amendment rights. Accordingly, we reverse the judgment of the trial court, vacate the conviction and remand the case.

**Suppression Hearing**

{¶ 2} Officer Ashenfelter, who made the traffic stop, testified at the hearing, and his testimony was accompanied by a dash-cam video that recorded the entirety of the traffic stop. The officer testified that he had been a state trooper with the Ohio State Highway Patrol for five years before joining the North Olmsted Police Department two weeks before the hearing, and he had handled over 2,000 traffic stops as a state trooper.

{¶ 3} On December 17, 2020, shortly before 11:05 a.m., while Officer Ashenfelter's patrol vehicle was stationary and he was observing traffic on I-71 near the Bagley Road exit in the city of Middleburg Heights, Byrd's vehicle traveled northbound on the highway passing his patrol vehicle. Byrd's vehicle drew his

attention because Byrd was hugging the steering wheel, which, according to Officer Ashenfelter, was an indication that the driver was nervous while driving past a police vehicle. Officer Ashenfelter proceeded to drive behind Byrd's vehicle. As he followed the vehicle, Byrd hit the brakes and made a lane change to exit the highway on the Bagley Road exit. Officer Ashenfelter testified that, as the vehicle exited the highway, he observed the vehicle drive across the solid white line on the right-hand side of the road — known as the fog line. At that point, Officer Ashenfelter decided to initiate a traffic stop.

{¶ 4} After both vehicles traveled off the highway and drove a short distance, Officer Ashenfelter turned on his lights and made the traffic stop at 11:05 a.m. He made contact with Byrd on the driver's side door. He advised her of his observation of the marked lanes violation and asked for her driver's license and insurance information. Byrd provided her license, a vehicle rental agreement, and insurance information for the vehicle. Officer Ashenfelter asked her where she was traveling from. She replied that she came from "the mall" and was going to an Aldi store off the exit. Because Byrd was traveling on I-71 north from the Strongsville area, he asked her if she was traveling from the Strongsville mall, and she stated that she came from the Great Northern Mall in North Olmsted. The officer was surprised by the answer because the Great Northern Mall is located in North Olmsted on the west side of Cleveland and she was traveling north on I-71. The officer repeated his question, and Byrd again stated she was traveling from North Olmsted to go to Aldi.

{¶ 5} Officer Ashenfelter then returned to his patrol vehicle to verify Byrd's license and check to see if she had an outstanding warrant. He learned the license was valid at 11:09 a.m. The officer acknowledged that the traffic violation investigation was complete around 11:10 a.m. He testified, however, that based on his past experience as a state highway trooper, the driver's nervousness and what he considered to be incongruous answers to his innocuous inquiry regarding her travel "were criminal indicators for me to suspect there's something more than just the simple traffic stop for the marked lanes violation going on with this traffic stop." The officer testified that, as he sat in his vehicle, he went over the account the driver provided about her travels and decided it did not make sense to him.

{¶ 6} The officer then returned to Byrd's vehicle and asked her again where she was traveling from. She again stated she was traveling from the Great Northern Mall and traveling to an Aldi store off the exit. She also added she went to a Speedway in North Royalton to get a special drink. The officer again found her answer implausible in light of the geographical location of the various places she mentioned. The officer also found Byrd to be talking fast, another sign of nervousness to him.

{¶ 7} Officer Ashenfelter then asked Byrd to exit her vehicle and come to his patrol vehicle. Byrd had a fanny pack on her person. Before she was placed in the backseat of the patrol vehicle, the officer asked her if she had a weapon on her person. She answered "no." The officer then asked her if he could pat her down for weapons, to which she consented. After the pat-down, Officer Ashenfelter asked

Byrd to place her fanny pack on the hood of his vehicle before entering his cruiser. He said to her that "as long as you check out, I'm going to probably just write you a warning." The fanny pack was then returned to Byrd's vehicle by Officer Ashenfelter.

{¶ 8} Officer Ashenfelter testified he placed Byrd inside the patrol vehicle so he could talk to her further and determine whether she was nervous about getting a traffic ticket or if she was nervous for something else unrelated to the traffic violation. After Byrd was placed in the backseat of the patrol vehicle, he asked her again about her travels. She stated that she came from North Olmsted and then went to North Royalton — which is east of Strongsville — to go to a Speedway gas station for a specialty drink and she was heading to Aldi. She tried to show the officer that she had googled Speedway gas station on her phone. This was also odd to Officer Ashenfelter because he knew there is a Speedway gas station in North Olmsted and she could have gone there instead of the Speedway gas station in North Royalton. Her travel from Great Northern to Strongsville and then North Royalton and Aldi in the Berea-Middleburg Heights area did not make sense to him. It was suspicious to him because she appeared to add more details to her story of where she was traveling. He testified that in his experience as an officer, the nervousness and an account of her travels that did not "add up" were "criminal indicators." The transcript reflects the following testimony:

> Q: In your experience as an officer that kind of story not adding up and nervousness, what, if anything, is that indicative of?

A: [They are] criminal indicators and, also, that there's something else going on with the traffic stop. Maybe guns, drugs or warrant or if you're suspended. So I already checked off that she wasn't suspended, that she doesn't have a warrant. So I have the other two, basically, criminal stuff that's involved.

Q. And you said those other two were guns and drugs?

A. Guns – guns or drugs.

{¶ 9} At 11:12 a.m., while Byrd was in the backseat of the patrol vehicle, Officer Ashenfelter called for a canine unit to respond to the scene. While the officer waited for the arrival of the canine, he talked to Byrd about the offense of marked lanes violation and they also conversed about her rental car. The officer testified he was writing out a warning ticket around this time but had not finished writing it when the canine arrived.

{¶ 10} At 11:18 a.m., a canine officer accompanied by a dog from the Middleburg Heights canine unit arrived at the scene. The dog walked around the vehicle and then "alerted on the vehicle." Officer Ashenfelter read Byrd her *Miranda* rights and advised Byrd he would be searching her vehicle due to the canine's alert. When Officer Ashenfelter asked Byrd if there was a gun or drugs in her vehicle, Byrd disclosed that a gun was in her vehicle. Officer Ashenfelter searched the vehicle and found a loaded handgun inside Byrd's fanny pack. Byrd explained she carried the gun for protection. At the end of the traffic stop, the officer issued Byrd a warning ticket for the marked lanes violation and advised her that weapons charges would be filed.

{¶ 11} The parties agreed that the dash-cam video indicated the traffic stop occurred at 11:05 a.m.; the officer learned the driver's license was valid at 11:09 a.m.; the traffic investigation was concluded at 11:10 a.m.; the canine unit was called at 11:12 a.m.; and the canine arrived at 11:18 a.m. The officer acknowledged that, after 11:10 a.m., he went beyond the traffic violation matter.

{¶ 12} The defense argued that there was no valid reason for the traffic stop and, furthermore, the traffic stop was extended to wait for a canine to arrive at the scene without a reasonable suspicion of criminal activity. Regarding the traffic stop, the trial court found the officer had probable cause to stop Byrd's vehicle for a marked lanes violation. As to her claim of the unlawfully prolonged detention, the trial court found the detention beyond the investigation of the traffic violation was justified based on the totality of the circumstances.

{¶ 13} After the trial court denied Byrd's motion to suppress, she pleaded no contest to the charges of improperly handling firearms in a motor vehicle and carrying concealed weapons, both fourth-degree felonies. The court sentenced her to 18 months of community-control sanctions for her offenses. Byrd now appeals, raising a single assignment of error and arguing the trial court erred in denying her motion to suppress.

**Law and Analysis**

{¶ 14} An appellate review of a motion to suppress presents a mixed question of law and fact. *State v. Burnside*, 100 Ohio St.3d 152, 2003-Ohio-5372, 797 N.E.2d 71, ¶ 8. We accept the trial court's findings of fact if they are supported

by competent, credible evidence. *State v. Preztak*, 181 Ohio App.3d 106, 2009-Ohio-621, 907 N.E.2d 1254, ¶ 22 (8th Dist.). Once we accept the factual findings as true, however, "'we must independently determine, as a matter of law and without deference to the trial court's conclusion, whether the trial court met the applicable legal standard.'" *Id.*, quoting *State v. Lloyd*, 126 Ohio App.3d 95, 709 N.E.2d 913 (7th Dist.1998).

## A. Validity of the Traffic Stop

{¶ 15} R.C. 4511.33 defines the offense of marked lanes violation.[1] The instant case involves a fog line, the single solid white line on the right-hand edge of a roadway. The Supreme Court of Ohio recently clarified that the statute prohibits *crossing,* but not *touching,* of a fog line. *State v. Turner*, 163 Ohio St.3d 421, 2020-Ohio-6773, 170 N.E.3d 842, ¶ 3. Byrd argues the traffic stop was invalid because her tires touched, but did not *cross* the fog line.

{¶ 16} "[A] traffic stop is constitutionally valid if an officer has a reasonable and articulable suspicion that a motorist has committed, is committing, or is about to commit a crime." *State v. Mays*, 119 Ohio St.3d 406, 2008-Ohio-4539, 894

---

[1] (A) Whenever any roadway has been divided into two or more clearly marked lanes for traffic, or wherever within municipal corporations traffic is lawfully moving in two or more substantially continuous lines in the same direction, the following rules apply:

(1) A vehicle or trackless trolley shall be driven, as nearly as is practicable, entirely within a single lane or line of traffic and shall not be moved from such lane or line until the driver has first ascertained that such movement can be made with safety.

N.E.2d 1204, ¶ 7. "[I]f an officer's decision to stop a motorist for a criminal violation, including a traffic violation, is prompted by a reasonable and articulable suspicion considering all the surrounding circumstances, then the stop is constitutionally valid." *Id*. at ¶ 8. The court has found a traffic stop lawful even if the traffic violations are minor, or "de minimis." *State v. White*, 8th Dist. Cuyahoga No. 100624, 2014-Ohio-4202, ¶ 14. Furthermore, the pertinent inquiry is whether the police officer had "'probable cause to believe that a traffic violation has occurred.'" *Turner* at ¶ 2, quoting *Whren v. United States*, 517 U.S. 806, 810, 116 S.Ct. 1769, 135 L.Ed.2d 89 (1996).

{¶ 17} Here, Byrd's operation of the vehicle was recorded in the patrol vehicle's dash-cam video. The trial court found the video depicted the majority of a tire went over the fog line, and our own review of the video shows it captures a fleeting moment of the vehicle's tire crossing the fog line. The pertinent question here, however, is not whether Byrd was guilty of the marked lanes violation but, rather, whether Officer Ashenfelter had "probable cause to believe that a traffic violation has occurred." *Turner* at ¶ 2. If so, the traffic stop was lawful. The trial court specifically found credible Officer Ashenfelter's testimony that he observed Byrd's tire to have crossed the fog line into the berm. We are bound to accept the trial court's finding of fact if it is supported by competent, credible evidence. Officer Ashenfelter's testimony coupled with the dash-cam video depicting Byrd's tire momentarily crossing the fog line establishes that Officer Ashenfelter had probable cause to believe a traffic violation had occurred, which justified his initiation of the

traffic stop.[2]    We note that Byrd did not allege at trial nor argue on appeal that Officer Ashenfelter was using the traffic violation as a pretext to investigate if she was engaging in any criminal activity.  Therefore, we do not address that issue in this case.

## B.  Whether the Traffic Stop Was Unlawfully Prolonged

{¶ 18} Byrd next argues the traffic stop was prolonged beyond the time necessary to complete the original purpose of the traffic stop, namely, to issue a traffic ticket or warning for the marked lanes violation.  She argues the police officer had no reasonable suspicion to prolong the traffic stop for the purpose of waiting for the arrival of the canine after his investigation of the traffic matter had been completed.  Having reviewed the pertinent case law authority, we agree.

{¶ 19} Here, after the stop, Officer Ashenfelter asked Byrd to provide her license and insurance information and he also asked her about her travels.  When a police officer detains a motorist for a traffic violation, the officer may delay the motorist for a time period sufficient to issue a ticket or a warning and this measure includes the time sufficient to run a computer check on the driver's license, registration, and vehicle plates.  *State v. Batchili*, 113 Ohio St.3d 403, 2007-Ohio-

---

[2] Byrd argues *Turner* supports her position, but her reliance on *Turner* is misplaced. The question under review in that case, as framed by the Supreme Court of Ohio, is: "Does an officer have reasonable and articulable suspicion to conduct a traffic stop of a motor vehicle for a marked lanes violation under R.C. 4511.33(A)(1) when the officer observes the tires of a vehicle driving on, but not across a marked lane line?"  *Id*. at ¶ 1.  The court answered the question in the negative.  The facts are different in this case.  Here, the officer testified that he observed Byrd's tire to have *crossed* the fog line.

2204, 865 N.E.2d 1282, ¶ 12. An officer may also ask the driver about matters unrelated to the traffic stop itself, provided the questions do not measurably extend the stop. *State v. Johns*, 2019-Ohio-4269, 146 N.E.3d 1286, ¶ 16 (5th Dist.), citing *Rodriguez v. United States*, 575 U.S. 348, 354, 135 S.Ct. 1609, 191 L.Ed.2d 492.

{¶ 20} After the traffic investigation was completed, Officer Ashenfelter extended the traffic stop because he found Byrd overly nervous and also found her account about her travels "not making sense." He asked Byrd to exit her vehicle and patted her down before placing her in the back of his patrol vehicle. This court has held that once a vehicle has been lawfully stopped for a traffic violation, the police officer may ask the driver to exit the vehicle and may pat down the driver's exterior clothing without violating the Fourth Amendment prohibition. *White,* 8th Dist. Cuyahoga No. 100624, 2014-Ohio-4202, at ¶ 19, citing *Pennsylvania v. Mimms*, 434 U.S. 106, 98 S.Ct. 330, 54 L.Ed.2d 313 (1977), and *State v. Moore*, 8th Dist. Cuyahoga No. 100401, 2014-Ohio-2979, ¶ 13. Byrd does not contest the lawfulness of the officer's conduct in these regards.

{¶ 21} After Byrd was patted down and placed in the backseat of his patrol vehicle, Officer Ashenfelter called for a canine unit to respond to the scene. As this court has also held, "[e]ven without a reasonable suspicion of drug-related activity, a lawfully detained vehicle may be subjected to a canine check of the vehicle's exterior." *State v. Jones*, 8th Dist. Cuyahoga No. 100300, 2014-Ohio-2763, ¶ 23; *Illinois v. Caballes*, 543 U.S. 405, 125 S.Ct. 834, 160 L.Ed.2d 842 (2005) (an exterior

dog sniff does not constitute a search within the meaning of the Fourth Amendment after a valid stop is initiated).

{¶ 22} Police officers are permitted to conduct a canine sniff during the time that it takes to issue a traffic citation provided the duration of the traffic stop is not extended beyond what is reasonably necessary to resolve the traffic violation matter. *In re $75,000.00 United States Currency*, 2017-Ohio-9158, 101 N.E.3d 1209, ¶ 28 (8th Dist.). "A traffic stop is not unconstitutionally prolonged when permissible background checks have been diligently undertaken and not yet completed at the time a drug dog alerts on the vehicle." *Batchili*, 113 Ohio St.3d 403, 2007-Ohio-2204, 865 N.E.2d 1282, at paragraph one of syllabus. However, the detention of a stopped driver may continue beyond the normal time frame only when additional facts are encountered giving rise to a reasonable, articulable suspicion of criminal activity beyond that which prompted the initial stop. *Id*. at ¶ 15.

{¶ 23} In this case, the dash-cam video shows Officer Ashenfelter handed a warning to Byrd at the end of the traffic stop, after the gun had been discovered in her vehicle. The evidence, however, is unclear as to the exact time the officer wrote the warning ticket for the marked lanes violation. Regardless, Officer Ashenfelter acknowledged that the traffic violation investigation was completed at 11:10. He called for the canine unit at 11:12, and the canine unit arrived at 11:18 a.m.

{¶ 24} Thus, the evidence reflects that the officer, after completing his traffic investigation, continued to detain Byrd to wait for the arrival of the canine unit. Officer Ashenfelter testified that Byrd's license was not suspended and there was no

outstanding warrant for her and, therefore, what remained to be investigated was the possibility that there were drugs or guns in her vehicle. Several appellate districts have held that if "the duration of the traffic stop is extended in order to bring a drug sniffing dog to the scene, police must have a reasonable suspicion that the vehicle contains drugs in order to justify the continued detention." *State v. Kuralt*, 2d Dist. Montgomery No. 20532, 2005-Ohio-4529, ¶ 11, citing *State v. Ramos*, 155 Ohio App.3d 396, 2003-Ohio-6535, 801 N.E.2d 523, ¶ 13 (2d Dist.) ("[w]here a canine drug search is involved, the police must have a reasonable suspicion that a vehicle contains drugs in order to detain a suspect further while a drug-trained canine is brought to the scene"). *See also State v. Lawler,* 2020-Ohio-849, 152 N.E.3d 962, ¶ 16 (3d Dist.); *State v. Catalan*, 5th Dist. Fairfield No. 2004-CA-00062, 2005-Ohio-4960, ¶ 42; *State v. Green*, 2016-Ohio-4810, 69 N.E.3d 59, ¶ 21 (7th Dist.) (evidence suppressed as there was no reasonable suspicion based on additional facts, such some odor or sighting of drugs or the driver appearing to be under the influence of drugs); *State v. Phillips*, 10th Dist. Franklin No. 14AP-79, 2014-Ohio-5162, ¶ 20; *State v. Eggleston,* 2015-Ohio-958, 29 N.E.3d 23, ¶ 31 - 32 (11th Dist.) (the officer did not have information sufficient to create a reasonable suspicion of criminal drug activity to justify prolonging the detention for the sole purposes of waiting for the K-9 unit to arrive)*; and State v. Blatchford*, 2016-Ohio-8456, 79 N.E.3d 97, ¶ 28 (12th Dist.).

{¶ 25} Reasonable suspicion requires more than an inchoate and unparticularized suspicion or hunch, and the police officer must base his suspicion on specific and articulable facts that criminal activity may be afoot. *Cleveland v. Maxwell*, 8th Dist. Cuyahoga No. 104964, 2017-Ohio-4442, ¶ 18-19, citing *Terry v. Ohio*, 392 U.S. 1, 21, 88 S.Ct. 1868, 20 L.Ed.2d 889 (1968). *See also Cleveland v. Kalish*, 2018-Ohio-682, 106 N.E.3d 881, ¶ 29 (8th Dist.). Furthermore, "[w]e determine the existence of reasonable suspicion by evaluating the totality of the circumstances, considering those circumstances 'through the eyes of the reasonable and prudent police officer on the scene who must react to events as they unfold.'" *State v. Heard*, 2d Dist. Montgomery No. 19323, 2003-Ohio-1047, ¶ 14, quoting *State v. Andrews*, 57 Ohio St.3d 86, 565 N.E.2d 1271 (1991).

{¶ 26} Here, the canine sniff occurred within 15 minutes of the traffic stop, which the courts have found to be a reasonable time to process a traffic citation. *State v. Brown*, 183 Ohio App.3d 337, 2009-Ohio-3804, 916 N.E. 2d 1138, ¶ 23 (6th Dist.). However, by Officer Ashenfelter's own testimony, he had completed his investigation of the traffic matter eight minutes before the canine's arrival. In order to justify the prolonged detention to effectuate a canine sniff of Byrd's vehicle, the officer was required to articulate specific facts to support a reasonable suspicion of drugs or guns. *Compare State v. Davis*, 9th Dist. Lorain No. 14CA010639, 2015-Ohio-4218, ¶ 16-17 (the police did not impermissibly extend the duration of the traffic stop because at the time of the canine sniff, the license check was not completed); and *State v. Brooks*, 3d Dist. Hancock No. 5-11-11, 2012-Ohio-5235 (the

traffic stop was not unlawfully extended because the trooper had yet to receive verification that the driver was in lawful possession of the vehicle when the canine alerted on the vehicle).

{¶ 27} Officer Ashenfelter testified that his suspicion was based on Byrd's nervousness and the account of her travels, which did not make sense to him. These observations at best support an inchoate and unparticularized hunch that criminal activity might be afoot. However, they do not constitute specific facts to support a reasonable suspicion justifying an officer extending a traffic stop so that a canine could confirm or dispel the officer's suspicion about illegal drug or gun activity. *State v. Byczkowski*, 2d Dist. Greene No. 2001 CA 31, 2001 Ohio App. LEXIS 5145 (Nov. 16, 2001) (evidence must be suppressed because, while the trooper thought something was amiss, he never articulated what that something was; the facts articulated by the trooper supported a hunch that the vehicle contained contraband but did not support a reasonable articulable suspicion to justify continued detention for a canine sniff after the traffic matter had been completed). *See also Ramos*, *supra*, at ¶ 19-20.

{¶ 28} Having evaluated the totality of the circumstances in this case, we conclude the police officer failed to articulate specific facts to support a reasonable suspicion justifying his prolonging the traffic stop for the purpose of a canine sniff of Byrd's vehicle. The trial court's finding of reasonable suspicion justifying a canine sniff is not supported by competent credible evidence contained in the record. In the absence of a reasonable articulable suspicion justifying a canine sniff, the

extension of her detention during the traffic stop infringed upon Byrd's rights under the Fourth Amendment to the United States Constitution against unreasonable searches and seizures. Byrd's second assignment of error is sustained.

{¶ 29} The judgment of the trial court denying Byrd's motion to suppress is reversed. Byrd's conviction is vacated. The matter is remanded to the trial court for further proceedings consistent with this opinion.

It is ordered that appellant recover of appellee costs herein taxed.

The court finds there were reasonable grounds for this appeal.

It is ordered that a special mandate issue out of this court directing the common pleas court to carry this judgment into execution.

A certified copy of this entry shall constitute the mandate pursuant to Rule 27 of the Rules of Appellate Procedure.

_____
MICHELLE J. SHEEHAN, PRESIDING JUDGE

LISA B. FORBES, J., CONCURS;
EMANUELLA D. GROVES, J., CONCURS (WITH SEPARATE OPINION ATTACHED)

EMANUELLA D. GROVES, J., CONCURRING:

{¶ 30} I concur with the majority opinion that held given the evidence and the trial court's findings, the officer had probable cause to stop Ms. Byrd, but the delayed traffic stop to effectuate a canine sniff of her vehicle was illegal.

{¶ 31} The majority notes, at ¶ 17, "[O]ur own review of the video shows it captures a fleeting moment of the vehicle's tire crossing the fog line." Officer Ashenfelter acknowledged that, after 11:10 a.m., he went beyond the traffic violation investigation. Majority opinion at ¶ 5. Nonetheless, he continued to detain Ms. Byrd in violation of her United States and Ohio constitutional right against unreasonable searches of her person and seizure of her property.

{¶ 32} "The Fourth Amendment to the Constitution of the United States and Section 14, Article, I, of the Constitution of Ohio, prohibit unreasonable searches of persons and seizure of their property. Evidence obtained by the state in violation of that prohibition must be suppressed from use by the state in its criminal prosecution of the person from whom it was seized." *State v. Baker*, 8th Dist. Cuyahoga No. 88665, 2007-Ohio-5450, ¶ 12. Confirmation of the commission of an alleged criminal act by the detained person should not overshadow the purpose of suppression. "The purpose of suppression is not to vindicate the rights of the accused person, who may very well have engaged in illegal conduct, but to deter the state from such acts in the future." *Id.*

{¶ 33} Although the majority opinion notes, at ¶ 17, "that [Ms.] Byrd did not allege at trial nor argue on appeal that Officer Ashenfelter was using the traffic violation as a pretext to investigate if she was engaging in any criminal activity," a review of the video reveals that Ms. Byrd is a person of color (black). I ponder, without deciding, if the traffic stop was a pretext to investigate if Ms. Byrd was engaging in criminal activity. In so doing, I find it critical to underscore that

suppressions regarding delayed traffic stops are for the countless unknown law-abiding travelers who are disproportionately people of color.[3]  They are stopped by law enforcement officers, delayed at the side of the roads, ordered by officers to exit their cars, patted down, and placed in the back of police cars.  Further, these travelers are left helplessly waiting for what seems like a lifetime and then told to "have a nice day," while having left behind pieces of their dignity and humanity, wondering, "what did I do wrong to be treated like a criminal?"  Basically, these individuals have no means to illuminate their delayed detainments, since no crime was committed.  However, the pieces of their dignity and humanity are left behind as the price they must pay to satisfy an officer's "hunch" that a crime was committed.

{¶ 34} It is the court's duty to ensure that this price of loss of humanity and dignity is minimal because, as stated by Judge Patricia Ann Blackmon in *State v. Baker*, 8th Dist. Cuyahoga No. 88665, 2007-Ohio-5450, ¶ 12, suppressions are also "to protect the integrity of the court and its proceedings."  Courts accomplish this by

---

[3] The Stanford Open Policing Project found that black and Hispanic drivers were often searched on the basis of less suspicion than white drivers, a double standard that is evidence of discrimination (the data set includes millions of stops across multiple states, including Ohio). https://slate.com/technology/2017/06/statistical-analysis-of-data-from-20-states-suggests-evidence-of-racially-biased-policing.html; https://openpolicing.stanford.edu/findings/. The ACLU of New York reported that between 2002 and 2011, 685,000 people were stopped and frisked by the New York City Police Department and yet 9 out of 10 of those people were found to be innocent of any wrongdoing.  The majority of the people stopped were black and brown. https://www.nyclu.org/en/stop-and-frisk-data.  A lawsuit severely curtailed the city's stop and frisks.  Still data from 2021 found that out of 8947 reported stops, 61 percent, or 5422 people, were found to be innocent.  87 percent of the total stopped were black or Latinx. *Id.*

eliminating illegally obtained evidence from consideration in criminal court proceedings. As here, once the officer secured the necessary information to complete the warning, Ms. Byrd should have been sent on her way and, if not, then any evidence secured thereafter must be suppressed. The scant evidence presented by the officer, in this case, is insufficient to rise to the level of reasonable articulable suspicion to justify the delayed stop.

{¶ 35} In the instant case, the officer's suspicions were not reasonable. Once he determined that Ms. Byrd had a valid license and no outstanding warrants, he should have issued the warning or citation and allowed her to go on her way. But, unfortunately, her routine traffic stop was illegally extended. As a result, the suppression from this illegal search should act as a deterrent. Consequently, the loss of dignity and humanity deposited alongside the road by future unknown law-abiding travelers should cease.