[Cite as *State v. Guice*, 2024-Ohio-1914.]

IN THE COURT OF APPEALS OF OHIO
FOURTH APPELLATE DISTRICT
SCIOTO COUNTY

| | | |
|---|---|---|
| STATE OF OHIO, | : | Case No. 22CA4010 |
| Plaintiff-Appellee, | : | |
| v. | : | <u>DECISION AND</u> <u>JUDGMENT ENTRY</u> |
| CANDACE D. GUICE, | : | |
| Defendant-Appellant. | : | **RELEASED 5/10/2024** |

_____
<u>APPEARANCES</u>:

Stephen T. Wolfe, Wolfe Law Group, LLC, Columbus, Ohio, for appellant.

Shane A. Tieman, Scioto County Prosecutor, and Jay Willis, Scioto County Assistant Prosecutor, for appellee.
_____
Hess, J.

**{¶1}** Candace D. Guice appeals her convictions on multiple counts of possession and trafficking of a fentanyl-related compound, with major drug offender specifications, possessing criminal tools, and designing a vehicle with a hidden compartment used to transport a controlled substance. The charges arose from a traffic stop during which a state trooper searched her vehicle and found 4 separate packages containing a fentanyl mixture weighing a combined total of over 545 grams. Guice contends the trial court erred when it denied her motion to suppress the evidence obtained during the traffic stop. Additionally, Guice challenges the indictment as containing multiplicitous counts, the jury's verdict on the charge of designing a vehicle with a hidden compartment as being unsupported by sufficient evidence and against the manifest weight of the evidence, and she contends that it was plain error for the trial court to allow statements regarding her

Fifth Amendment right to remain silent to be introduced at trial. For the following reasons, we affirm.

## I. FACTS AND PROCEDURAL HISTORY

{¶2} The Scioto County grand jury indicted Guice on four first-degree felony counts of trafficking in a fentanyl-related compound and four first-degree felony counts of possession of a fentanyl-related compound. Three of the possession and trafficking charges included major drug offender specifications. The indictment also included charges for possessing criminal tools, a fifth-degree felony, and designing a vehicle with a hidden compartment used to transport a controlled substance, a second-degree felony. Guice moved to suppress all evidence obtained from the traffic stop that led to the charges, and the trial court conducted a hearing on the motion.

{¶3} At the suppression hearing, Ohio State Highway Patrol Trooper Nick Lewis testified that he worked on the criminal interdiction team, with a focus on drug interdiction. He has worked in criminal drug interdiction for approximately 15 years. Trooper Lewis testified that on January 12, 2022, he was on duty in a marked cruiser sitting stationary on U.S. 23 in Scioto County, Ohio. A southbound vehicle with Tennessee plates, which he believed to be a rental car, passed him heading southbound on U.S. 23 shortly before noon. Trooper Lewis testified that he pays particularly close attention to rental vehicles because they are commonly used for drug trafficking. Trooper Lewis decided to follow the vehicle, which exited off U.S. 23 and onto State Route 823. As they were "coming down the hill the vehicle crosses over the white fog line there. As we go back up to the top of the hill on the other side there's a slight left curve in the roadway, the vehicle crosses over the - - the white fog line at that point too." Trooper Lewis explained that half of the tire's

width crossed over the white fog line. "So, you've actually crossed over the fog line and you're into the other side of the pavement." He was also pacing the vehicle's speed, which was travelling approximately ten m.p.h. under the speed limit. Although the vehicle's slow speed was not a violation, it could be an indicator of impairment.

{¶4} Trooper Lewis testified that at approximately noon he initiated a traffic stop based on the fog line violations. He approached the vehicle and spoke to the driver, Guice. He obtained a copy of her car rental document and her Michigan driver's license and asked her "what brought her down this way." Trooper Lewis testified that Guice was unable to tell him where she was going. Initially she told him, "K-S" and then "Kentucky State." However, Guice was three hours away from Kentucky State and headed in the wrong direction. Guice then told him she was coming from the Bowling Green area and that she was headed to Kent State, not Kentucky State. Again, Trooper Lewis was suspicious because Guice was far off from any plausible route between Bowling Green and Kent State, which is in the Akron area and at least three hours north. "[I]f you're three hours off your trip and you say you're going to Kentucky State, and then you tell me you're going to Kent State, at this point I'm thinking there's something else going on, because we went three hours west to three hours north and you're still headed the wrong direction to go to either one of those schools.* * * At this point I'm thinking there's something criminal going on."

{¶5} Trooper Lewis testified that Guice's use of a rental car and her inability to tell him where she was going raised suspicions that she was engaged in drug trafficking. He explained, "Typically, I'll get an address that they put in their GPS, but they have no idea where they are headed to. So they'll make up a story when they get stopped * * *."

"[N]ormal people know where their [sic] headed to. Drug traffickers don't know where they're headed to. They just have an address in their phone where they're supposed to go from Point A to Point B and once I get there then that's where I'm at. They have no idea where they're ultimately headed to."

**{¶6}** Trooper Lewis also testified that because Guice was driving a rental car and did not know where she was going, he immediately radioed for a canine drug-sniffing unit and then walked back to his cruiser. When he returned to his cruiser, he contacted dispatch for information about the validity of her license, outstanding warrants, and a criminal history check; he reviewed the car rental document; and he checked the locations of Kentucky State and Kent State in relation to Guice's travel path. He testified that he does not decide whether to write up a citation or give a warning until he receives information back from dispatch on the validity of the license, the existence of warrants, and criminal history. Guice's driver's license indicated she was from the Detroit area, which Trooper Lewis testified is a major drug source city. A major drug route runs from Detroit to Huntington, West Virginia, which was the route on which Guice traveled.

**{¶7}** Trooper Lewis saw that Guice's rental document stated that the rental expired the previous day. The rental car customer was "AG Miles" and Guice was listed as an authorized additional driver. Trooper Lewis went back to Guice's vehicle to discuss the expired car rental with her. Trooper Lewis testified that the rental document contained a phone number to call to extend or change the lease term and indicated that extra charges may apply. Guice acknowledged that the rental car was expired but stated that she was planning to extend it and had not done so yet. While they were discussing the rental car situation, the canine unit arrived and performed a drug sniff of the vehicle but

the canine did not give a positive indication for drugs. At this point, the traffic stop had been going on for approximately ten minutes. At ten minutes into the stop, Trooper Lewis had not yet received any information back from dispatch concerning Guice's driver's license, her warrants, or her criminal history.

{¶8}    Trooper Lewis asked Guice for her consent to search the vehicle. Guice consented to the search and stepped out of the vehicle as requested. Trooper Lewis asked Guice if he could pat her down and she said, "that's fine." He explained the pat down procedure, they had a brief discussion, and he proceeded to pat down Guice. He did not find any weapons during the pat down. Trooper Lewis explained that he did not think that Guice was armed, but because he would be turned away from her while he searched the vehicle, the pat down was for his safety. "I have no idea if she's got anything around her waistband, in her bra area, anything like that * * *." After the pat down, Trooper Lewis asked Guice again "if she cared if I looked inside her vehicle. She says, 'No, that's fine.' " At this point they are approximately 12 minutes into the traffic stop and Trooper Lewis has not received any information back from dispatch.

{¶9}    Trooper Lewis's search of Guice's vehicle (both interior and exterior) took approximately ten minutes during which he asked her a third time if she cared if he searched it and Guice said "No. That's fine." At approximately 10 minutes into the search and 22 minutes into the traffic stop, Trooper Lewis discovered a zip tie hanging from the bottom part of the vehicle and crawled under the vehicle to discover that the zip tie was connected to a magnetic box. Trooper Lewis testified that he has seen magnetic boxes underneath vehicles in approximately 25 to 30 stops and 100% of the time the boxes contained illegal drugs. After discovering the magnetic box, Trooper Lewis instructed

Guice to get into the back seat of his cruiser. At 22 minutes into the traffic stop, he has still not heard anything back from dispatch concerning her driver's license, warrants, or criminal history. While she is in the back seat of the cruiser, another officer gives Guice a *Miranda* warning and at approximately 22 minutes into the traffic stop Guice signs a written consent form to search her vehicle which also includes the remark, "consent was obtained verbally prior to the search." Trooper Lewis returns to the vehicle, removes the magnetic box, opens it, and discovers four packages of a white substance later determined to be a fentanyl mixture.

**{¶10}** Trooper Lewis testified that he did not recall when dispatch got Guice's information to him, but the time stamp on the report contains the time 12:38. Thus, Trooper Lewis believes that if dispatch received the information at 12:38, they would have conveyed it to him at or around that same time. Thus, the dispatch information about Guice's license, warrants, and criminal history would have first been available approximately 15 minutes after Trooper Lewis discovered the magnetic box and Guice was given her Miranda warning and approximately 38 minutes into the traffic stop.

**{¶11}** To summarize, the traffic stop began at 12:00 p.m., the trooper requested relevant information from dispatch at 12:03 p.m., the zip tie and magnetic box were discovered at 12:22 and 12:25 p.m. respectively, and dispatch returned information about Guice's license, warrants, and criminal history at 12:38 p.m. The time it took dispatch to respond to the trooper's request was 35 minutes.

**{¶12}** The trial court questioned Trooper Lewis about the length of time it took for dispatch to return information to him: "Is there any – delay maybe isn't the right word. Is [sic] there any difficulties in obtaining that information or any reasons that would take

longer to obtain that information from an out of state driver?" Trooper Lewis replied, "That would have to be something our dispatcher would have to look - - I know that I'm going to assume there is, because I know some dispatchers have a lot harder time finding that information as opposed to other dispatchers." Earlier Trooper Lewis testified that when he is working within Scioto County his requests go to the "Portsmouth dispatch center, which also covers Pike County, Scioto County, and the Ironton Post, Lawrence County." There was no testimony that this multi-county coverage scenario typically resulted in delays or that it explained the 35-minute lag associated with obtaining Guice's information.

{¶13} Trooper Lewis testified that he looked at the totality of the circumstances: (1) Guice's lane violations and slow speed on State Route 823 "is typically someone that's wanting me to pass them, because they're typically involved in something criminal;" (2) Her lack of knowledge about where she was going, "three hours off wrong – each direction and she's still headed the wrong way;" (3) A rental car that was supposed to have been returned to the agency the day before "and she's still driving it;" (4) the fact that she was from Detroit – a major drug source city and travelling on a major drug route from Detroit towards Huntington, West Virginia. "All that in the totality of the circumstances, yeah, I believe she was involved in criminal activity."

{¶14} The trial court denied the motion to suppress. The court found that Trooper Lewis "noticed the vehicle travel across the outside portion of the white, right edge line ('fog line') by ½ a tire width, on two (2) occasions." The court found that Trooper Lewis stopped the vehicle for the lane violations and to determine if the driver was lost or intoxicated. Trooper Lewis learned Guice was the driver and that the vehicle was a rental

car. "However, the lease was for one (1) day and the term had expired the previous day,

although the vehicle had not been returned to the lessor." The trial court found that Guice

told Trooper Lewis she "was going to extend the lease, but had not yet done so." Guice

offered no evidence at the suppression hearing that she had extended the car rental

agreement.

**{¶15}** The trial court summarized the key events of the traffic stop:

> Within three minutes and twenty seconds of the traffic stop Trooper Lewis
> had obtained defendant's driver's license, personal information, and
> inconsistent story about where she was going and radioed that information
> to dispatch seeking driver[']s license and other information concerning
> defendant. Within thirteen minutes defendant had consented to the search
> of her vehicle and within sixteen minutes had consented multiple times to
> the search of her vehicle. Within twenty-five minutes troopers had located
> the magnetic box under defendant's vehicle. Within thirty-nine minuets [sic]
> defendant[']s information on vehicle information and computer history was
> received by the State Patrol.

**{¶16}** The trial court concluded that Guice had no standing to contest the search

because she had no reasonable expectation of privacy in the expired rental car:

> * * * Knowingly failing to return hired or rented property as required by the
> contract of hire or rental, without reasonable excuse for the failure is prima
> facia evidence of an intent to defraud a livery. R.C. §2913.41.
>         In this matter defendant was no longer in lawful possession of the
> rental vehicle once the lease term had expired. She did not offer [a]
> reasonable excuse for the holdover, but instead admitted the hold over [sic]
> and indicted [sic] she had planned to extend the rental. She had not done
> so at the time of the stop and search, and she had offered no evidence that
> she did during or after the traffic stop.
>         This Court finds that defendant had no reasonable expectation of
> privacy in the vehicle held past the lease expiration and as such had no
> standing to contest the search.

Even though the trial court found Guice had no standing to contest the search, it went on

to address the constitutionality of the search.

{¶17} The trial court concluded that Trooper Lewis had reasonable suspicion to stop Guice's vehicle because his testimony about the fog line violations was credible, and, though the police video did not capture the lane violations because they occurred prior to the video's activation, later segments showed the vehicle driving on the fog lines. "[T]hat testimony of lane violations and the repeated driving on the white fog line gave Trooper Lewis a reason to suspect that the driver of the vehicle was either intoxicated or distracted in her driving."

{¶18} The trial court also concluded that the length of time for the traffic stop was reasonable, "The metallic[1] box containing the fentanyl was found well before his information was returned to Trooper Lewis from his dispatch center. Further, the time between sending this information to dispatch and finding the metallic box was twenty-five (25) minutes, which was within a reasonable time to write a citation or warning, given the inconsistencies from defendant."

{¶19} The trial court concluded that Guice had no expectation of privacy in the exterior of her vehicle. It found that Guice had a magnetic box attached to the undercarriage of her rental vehicle. "One of the zip-ties was seen by Trooper Lewis upon looking under the vehicle." Trooper Lewis then "found the magnetic box attached to the vehicle's undercarriage. Defendant had no expectation of privacy in this box hidden on the outside of her vehicle."

{¶20} The trial court found that Guice consented to the search of her person and the search of her vehicle. And, any statements Guice made prior to being given her *Miranda* warning were not a result of custodial interrogation and would not be suppressed.

---

[1] The trial court used the terms metallic and magnetic interchangeably in describing the box.

{¶21}  The matter proceeded to a jury trial. Trooper Lewis testified about the traffic stop in a manner consistent with the testimony given at the suppression hearing. Trooper Lewis also testified that he had stopped two other vehicles that had been rental cars rented by A.G. Miles and both drivers were charged with transporting illegal drugs. One of the drivers admitted that he was transporting drugs for Miles and the other driver, like Guice, made phone calls to Miles from jail.

{¶22}  An employee with the Ohio Patrol Crime Lab testified about testing the 4 packages of powder found in the magnetic box and confirmed that each of the 4 packages contained a fentanyl, phencyclidine (PCP), and heroin mixture, weighing a combined total of over 545 grams.

{¶23}  A Hertz Rental Car employee testified about the car rental procedure and testified that Guice was an authorized driver on the rental car, but the car rental was made by an individual named A.G. Miles. The Hertz employee testified that Miles rented cars for Guice to drive on a number of occasions: (1) August 11 to 14, 2021, driven 1,348 miles; (2) August 21 to 23, 2021, driven 286 miles; (3) September 7 to 10, 2021, driven 874 miles; (4) October 29 to 30, 2021, driven 470 miles; (5) November 30 to December 10, 2021, driven 2,959 miles; (6) December 21 to 28, 2021, driven 2,583 miles; and (7) January 10, 2022 – the rental during which Guice was stopped and the illegal drugs were seized – driven 593 miles.

{¶24}  Ohio State Highway Patrol Trooper Anthony Day testified that he is assigned to a specialty canine program in the criminal interdiction unit. He testified that the canines are not trained in detecting the odor of fentanyl because of the extreme deadly hazard involved. Trooper Day testified that he places a "huge" significance on the fact

that the vehicle involved in the stop was a rental car because under the state forfeiture laws, a vehicle that is rented and not owned is not subject to forfeiture. It is usually a "plain-Jane car" that is "not going to stick out" and is "just going to fit in with the flow of traffic." Trooper Day testified that he assisted with the search of Guice's vehicle and after they discovered the magnetic box under Guice's car, he informed her of her *Miranda* rights. Trooper Day testified that Guice was using her cell phone while in the back seat of the cruiser and the first thing she said on the call was, "My bad." Trooper Day testified that he had been involved in another traffic stop during which they found a substantial amount of drugs hidden in a coffee can. The driver told Trooper Day that he had been hired by Anton Glenn Miles to take the drugs to Huntington and that it was his third trip doing so.

{¶25} Detective Sergeant Jodi Conkel of the Scioto County Sheriff's Office testified that she is familiar with the operations of the Scioto County Jail and the jail telephone system. Detective Conkel testified that the first six calls Guice made after she was booked into the jail and the last two calls she made before she was released on bond were to Anton Glenn Miles in Southfield, Michigan. Detective Conkel testified that Guice and Miles talked about Guice's defense: it was Hertz's fault, and the drugs were left on the car from a prior rental. Miles also stated he would be posting bond and coming for her, and she should not talk to anyone.

{¶26} Guice testified in her defense. Guice knew Anton Glenn Miles as a close family friend, "so he kind of adapted to being like an older brother to me." Guice testified that Miles does things for her, and he rented the car in which she was traveling on January 12, 2022 because her car was being repaired. Guice went with Miles to the Hertz rental

agency and picked up the car on Monday, January 10, 2022 and drove to Bowling Green, Ohio to visit a cousin. From there, she was traveling to Grayson, Kentucky and was planning to head back to Michigan on Saturday. Guice said another cousin and a girlfriend lived in Grayson. Guice cooperated when she was stopped by Trooper Lewis and she testified that she had no knowledge that the vehicle had a container filled with drugs. Guice testified that Miles had rented cars for her before on different occasions because, "I needed to transport around. * * * It can be I just want to get out and get some air. I need a ride to work. * * * Just different reasons."  Guice could not tell the officers where she was headed because "I'm a Generation Z Baby. We actually use technology and electronics a lot. * * * I don't actually go and say, 'Hey, what's the name of this place again.'  Just send me the right address and I'm there, or I'll see you when I get there."

{¶27}  Guice testified that when Trooper Lewis told her to step out of her vehicle she "felt like I didn't really have no rights. I didn't have rights." However, she testified that when the trooper offered her a seat in the back of his cruiser during the vehicle search, she refused and told him she would stand outside the cruiser next to the guardrail. Even though Guice testified that she had known Miles all of her life and he was like a brother to her, she also testified that she did not know his birthday, did not know he had multiple criminal convictions, did not know he had a conviction for armed robbery, did not know he had a conviction for weapons and drugs or for delivering and manufacturing controlled substances. On the previous occasions on which Miles rented a car for her, Guice needed a car for "a friend's birthday" or during the "holiday season, so I just wanted a vehicle, you know, to travel around for Christmas." Guice testified that she could not give specifics of her use of the rental cars Miles rented for her:

A: Again, I have an older car that actually have [sic] a lot of problems sometime [sic] and if my car isn't working and I need to do something or go somewhere, then I ask him to reserve and pick a car for – pick up a car for me. I have to be there as well. I have to be present. * * * Can I go back on each dates [sic] and go over why I drove this many miles, or where I was going, or what I was doing, at that exact time when this stuff is like a year ago, I – I'm sorry, I cannot do that.

Q. So, you're telling this jury that you got seven rentals through AG Miles in six months and you weren't running dope for this guy?

A. Oh, definitely not.

Q. Definitely not. 8,520 miles in 28 days worth of rentals.

                    *          *          *

Q. So, who's paying for all these rentals? It looks like $4,631.00 in six months. You or Mr. Miles?

A. Myself and I do have a supportive mom. She helps me sometime [sic] if I need it.

{¶28} The jury found her guilty on all counts. The trial court merged the possession charges into the trafficking charges and then merged all the trafficking charges into Count 4 and sentenced Guice to serve a minimum prison term of 11 years to a maximum of 16.5 years on Count 4 - trafficking, an additional mandatory term of 5 years for the major drug offender specification, a term of 6 months for possessing criminal tools, and a term of 4 years for designing a vehicle with a hidden compartment  used to transport a controlled substance. The sentences were ordered to be served consecutively for an aggregate sentence of a minimum prison term of 20.5 years to an indefinite maximum term of 26 years. Guice appealed.

## II.  ASSIGNMENTS OF ERROR

{¶29} Guice presents five assignments of error:

1.  The trial court erred when it denied appellant's motion to suppress.

2. The drug quantities should have been aggregated.

3. The evidence presented at trial was insufficient to support the convictions.

4. The jury's verdicts were against the manifest weight of the evidence.

5. It was plain error for the trial court to allow statements regarding appellant's Fifth Amendment right to remain silent.

### III. LAW AND ANALYSIS

#### A. Motion to Suppress

**{¶30}** Guice contends that the trial court erred when it denied her motion to suppress because she had standing to challenge the search and the scope of the search was unconstitutional.

#### 1. Standard of Review

**{¶31}** In general "appellate review of a motion to suppress presents a mixed question of law and fact." *State v. Codeluppi*, 139 Ohio St.3d 165, 2014-Ohio-1574, 10 N.E.3d 691, ¶ 7, citing *State v. Burnside*, 100 Ohio St.3d 152, 2003-Ohio-5372, 797 N.E.2d 71, ¶ 8. The Supreme Court of Ohio has explained:

> When considering a motion to suppress, the trial court assumes the role of trier of fact and is therefore in the best position to resolve factual questions and evaluate the credibility of witnesses. Consequently, an appellate court must accept the trial court's findings of fact if they are supported by competent, credible evidence. Accepting these facts as true, the appellate court must then independently determine, without deference to the conclusion of the trial court, whether the facts satisfy the applicable legal standard.

(Citations omitted.) *Burnside* at ¶ 8.

**{¶32}** "The Fourth Amendment to the United States Constitution and the Ohio Constitution, Article I, Section 14, prohibit unreasonable searches and seizures." *State v. Emerson*, 134 Ohio St.3d 191, 2012-Ohio-5047, 981 N.E.2d 787, ¶ 15. The Supreme

Court of Ohio has held that these provisions provide the same protection in felony cases. *State v. Hawkins*, 158 Ohio St.3d 94, 2019-Ohio-4210, 140 N.E.3d 577, ¶ 18. "This constitutional guarantee is protected by the exclusionary rule, which mandates the exclusion at trial of evidence obtained from an unreasonable search and seizure." *State v. Petty*, 4th Dist. Washington Nos. 18CA26 & 18CA27, 2019-Ohio-4241, ¶ 11.

**{¶33}** " '[S]earches [and seizures] conducted outside the judicial process, without prior approval by judge or magistrate, are per se unreasonable under the Fourth Amendment—subject only to a few specifically established and well-delineated exceptions.' " (Footnotes omitted and alterations sic.) *State v. Conley*, 4th Dist. Adams No. 19CA1091, 2019-Ohio-4172, ¶ 17, quoting *Katz v. United States*, 389 U.S. 347, 357, 88 S.Ct. 507, 19 L.Ed.2d 576 (1967). "Once a defendant demonstrates that he or she was subjected to a warrantless search or seizure, the burden shifts to the state to establish that the warrantless search or seizure was constitutionally permissible." *State v. Dorsey*, 4th Dist. Scioto No. 19CA3874, 2019-Ohio-3478, ¶ 13.

2.   Reasonable Expectation of Privacy – Guice's Fourth Amendment Standing

**{¶34}** Initially, Guice contends the trial court erred when it determined that she did not have standing to challenge the search because she did not have a reasonable expectation of privacy. The trial court found that because Guice had not extended the rental term at the time the stop occurred, she "was no longer in lawful possession of the rental vehicle once the lease term had expired. * * * The Court finds that [Guice] had no reasonable expectation of privacy in the vehicle held past the lease expiration and as such had no standing to contest the search." The question of whether a driver has an

expectation of privacy in a rental car with an expired lease term appears to be one of first impression in Ohio.

{¶35} The Supreme Court of Ohio has explained that Fourth Amendment standing is different from jurisdictional standing and means that a person has a cognizable Fourth Amendment interest in the place searched:

> Before we get into our analysis, it is important to clarify what we mean when we talk about Fourth Amendment standing. The concept is distinct from jurisdictional standing, which may never be waived. Rather, the word "standing" in the Fourth Amendment context is merely "shorthand for capturing the idea that a person must have a cognizable Fourth Amendment interest in the place searched." In other words, has the person claiming the constitutional violation " 'had his own Fourth Amendment rights infringed by the search and seizure which he seeks to challenge' "? Because Fourth Amendment standing is not a jurisdictional question, it need not be addressed before other aspects of a Fourth Amendment claim. (Citations omitted.)

*State v. Wintermeyer,* 158 Ohio St.3d 513, 2019-Ohio-5156, 145 N.E.3d 278, ¶ 9. Because standing is not a jurisdictional issue, "it need not be decided at the outset of a hearing; rather, the trial court is free to consider substantive matters in any order it chooses—for example, the court may elect to decide the issue of probable cause * * * before reaching the question of standing (or without reaching the standing question at all)." *Id.* at ¶ 22.

{¶36} The Supreme Court of Ohio has held that an individual who is in lawful possession of a vehicle, although not the titled owner, does possess a legitimate expectation of privacy in the vehicle searched, if he or she can demonstrate that the owner gave them permission to use the vehicle. *State v. Carter*, 69 Ohio St.3d 57, 63, 630 N.E.2d 355 (1994); *State v. Houston*, 4th Dist. Scioto No. 12CA3472, 2013-Ohio-686, ¶ 18 (trial court properly determined that defendant, as individual who

had rented the vehicle, had standing to challenge a search); *State v. Hale,* 5th Dist. No. 02CA00024, 2002–Ohio–4537, ¶ 12 (because appellant was never legally in possession of a rental vehicle and vehicle had been stolen from Alamo Rent–a–Car three months earlier, appellant lacked standing to challenge the search of stolen vehicle).

{¶37}  In *State v. Henderson,* 5th Dist. No. 07COA031, 2008–Ohio–5007, ¶ 29-30, the court of appeals held that a defendant had standing to challenge the search of a rental vehicle even though he was not an authorized driver of the vehicle. The appellate court noted that although appellant's possession might be challengeable as a civil wrong, it did not render his expectation of privacy null and void.

> [T]he issue is whether appellant's mere possessionary use, though unlawful use, can bootstrap the issue of standing. Under the very strict interpretation of the facts sub judice, we find appellant had standing to challenge the search. *Appellant's possession may have been contractually unauthorized, but this was a civil wrong, not a criminal wrong.* To permit the issue of standing to be a bar to all of the millions of individuals who cannot establish a right to drive another's vehicle would be beyond the pale. Appellant's possession of the vehicle may be challengeable civilly, but it does not render his expectation of privacy null and void. (Emphasis added.)

*Id.* at ¶ 30; *but see State v. Wells.* 5th Dist. Richland No. 2021CA0077, 2022-Ohio-2903, ¶ 24 (finding defendant lacked standing to challenge the search of the vehicle where the vehicle was owned by the rental company, it was leased to someone other than defendant, the rental agreement had lapsed, and defendant was not an authorized driver of the vehicle).

{¶38}  In *Byrd v. United States*, 584 U.S. ___, 138 S.Ct. 1518, 200 L.Ed.2d 805 (2018), the Supreme Court of the United States unanimously held that the fact that a defendant had violated the rental car agreement signed by a third party did not eliminate any reasonable expectation of privacy he had in the vehicle. "The mere fact that a driver

in lawful possession or control of a rental car is not listed on the rental agreement will not defeat his or her otherwise reasonable expectation of privacy." *Id.* at 1531.

{¶39} In *Byrd,* Terrence Byrd and his friend Latasha Reed drove Byrd's car to a Budget car rental agency in New Jersey. Reed rented a car while Byrd stayed outside in his car. The rental car agreement restricted who may drive the rental car. The only authorized drivers were the renter, the renter's spouse, the renter's co-employee, or a person who appears at the time of the rental and signs as an additional driver. The agreement warned that "permitting an unauthorized driver to operate the vehicle is a violation of the rental agreement" which "may result in any and all coverage otherwise provided by the rental agreement being void" and the renter "being fully responsible for all loss or damage * * *." *Id.*  Reed did not list anyone else as an additional driver. She returned to the parking lot, gave Byrd the keys to the rental car, and drove away in Byrd's car, leaving Byrd in possession of the rental car. Byrd drove the rental car home, put personal belongings in the rental car, and drove it alone towards Pittsburgh, Pennsylvania.

{¶40} Byrd was stopped by the Pennsylvania state troopers about halfway to Pittsburgh. Byrd handed an interim license and the car rental agreement to the trooper and told the trooper that a friend had rented the car. The trooper noticed that Byrd was not listed as an additional driver on the rental agreement and remarked about this to his fellow trooper, who, in turn, replied, "yeah, he has no expectation of privacy." The troopers eventually searched the rental car without Byrd's consent and found 49 bricks of heroin in the trunk.

**{¶41}** Byrd moved to suppress the evidence found in the rental car's trunk on Fourth Amendment grounds. The trial court denied his motion on the ground that Byrd lacked standing and did not reach the question of whether the trooper had probable cause to search the vehicle. The appellate court affirmed the suppression ruling on the same ground, recognizing "a circuit split exists as to whether the sole occupant of a rental vehicle has a Fourth Amendment expectation of privacy when the occupant is not named in the rental agreement." *Id.* at 1525. The appellate court found that the law in its own circuit (Third Circuit) had already determined that "such a person has no expectation of privacy and therefore no standing to challenge a search of the vehicle." *Id.* at 1525. On that basis the appellate court affirmed the suppression ruling and did not reach the probable cause question. The United States Supreme Court accepted the case to address the circuit split, noting that the Sixth Circuit was on the opposite side of the split. *Id.* at 1526. *See United States v. Smith*, 263 F.3d 571, 581-587 (6th Cir. 2001) ("we refuse to adopt a bright line test * * * based solely on whether the driver of a rental vehicle is listed on the rental agreement as an authorized driver" because such test is too rigid; the defendant had a legitimate expectation of privacy which was reasonable in light of all the surrounding circumstances even though he was not listed as an authorized driver on the rental agreement).

**{¶42}** The Court emphasized the importance of the Fourth Amendment to individual liberty:

> Few protections are as essential to individual liberty as the right to be free from unreasonable searches and seizures. The Framers made that right explicit in the Bill of Rights following their experience with the indignities and invasions of privacy wrought by "general warrants and warrantless searches that had so alienated the colonists and had helped speed the movement for independence." Ever mindful of the Fourth Amendment and

its history, the Court has viewed with disfavor practices that permit "police officers unbridled discretion to rummage at will among a person's private effects." (Citations omitted.)

*Byrd* at 1526. The Court noted that, "it is by now well established that a person need not always have a recognized common-law property interest in the place searched to be able to claim a reasonable expectation of privacy in it." At the same time, "it is also clear that legitimate presence on the premises of the place searched, standing alone, is not enough to accord a reasonable expectation of privacy, because it 'creates too broad a gauge for measurement of Fourth Amendment rights.' " *Id.* at 1527, quoting *Rakas v. Illinois*, 439 U.S. 128, 142, 99 S.Ct. 421, 58 L.Ed.2d 387 (1978).

{¶43} The Court rejected the government's argument that "only authorized drivers of rental cars have expectations of privacy in those vehicles." The Court found that because Byrd was the driver and sole occupant of the rental car, his situation was more closely analogous to the defendant in *Jones v. United States*, 362 U.S. 257, 80 S.Ct. 725, 4 L.Ed.2d 697 (1960), who had a reasonable expectation of privacy in his friend's apartment because his friend gave him the use of the apartment and the keys to it while the friend was out of town. Thus, "he 'had complete dominion and control over the apartment and could exclude others from it.' " *Byrd* at 1528, quoting *Rakas*, 439 U.S. at 149. The Court found that the reasonable expectation of privacy and the right to exclude would not differ "depending on whether the car in question is rented or privately owned by someone other than the person in current possession of it, much as it did not matter whether the friend of the defendant in *Jones* owned or leased the apartment he permitted the defendant to use in his absence. Both would have the expectation of privacy that comes with the right to exclude."  The government had conceded that Byrd, like the

defendant in *Jones*, had the right to exclude third parties, such as a carjacker. *Id.* at 1528-1529.

**{¶44}** And, important to our analysis of Guice's circumstances, the Court also rejected the government's argument that Byrd's driving of the rental car violated the rental agreement and that "this violation meant Byrd could not have had any basis for claiming an expectation of privacy in the rental car at the time of the search." First the Court noted that "anyone who has rented a car knows" rental car agreements "are filled with a long list of restrictions." *Id.* at 1529. "Few would contend that violating provisions like these has anything to do with a driver's reasonable expectation of privacy in the rental car – as even the Government agrees." *Id.*

**{¶45}** The Court noted that there may be "countless innocuous reasons why an unauthorized driver might get behind the wheel of a rental car and drive it" such as the renter becomes drowsy and they both decide it is safer for the friend to drive. The Court recognized this constitutes a breach, "perhaps a serious one," of the rental agreement, but the government failed to explain "what bearing this breach of contract, standing alone, has on expectations of privacy in the car."

> [F]or Fourth Amendment purposes there is no meaningful difference between the authorized-driver provision and the other provisions the Government agrees do not eliminate an expectation of privacy, all of which concern risk allocation between private parties—violators might pay additional fees, lose insurance coverage, or assume liability for damage resulting from the breach. But that risk allocation has little to do with whether one would have a reasonable expectation of privacy in the rental car if, for example, he or she otherwise has lawful possession of and control over the car.

*Byrd* at 1529.

**{¶46}** The government also argued that Byrd was the equivalent of a car thief because he used a third-party strawman to acquire the car knowing he would not have been able to acquire the car on his own. The Court noted that even if the government's allegations were true, it was unclear whether they "would constitute a criminal offense in the acquisition of the car under applicable law."  However, even if there were no distinction between someone who procures a rental car by a fraudulent scheme and a car thief, the government did not raise this argument in either of the lower courts and the Court declined to reach that issue.

**{¶47}** Although we find Guice's circumstances to have a few factual differences from those in *Byrd,* we find the legal principles and analysis to be instructive and compelling. First, Guice was an authorized driver on the rental agreement. She presented a valid driver's license and a rental document to the trooper which showed that she was an authorized driver of the rental car. Furthermore, unlike Byrd, there was no evidence presented that Guice breached the rental agreement. Although Guice was driving the car beyond the return date identified the in rental document, the document allowed for extensions and additional fees if the car was kept beyond that date. The rental document states that the "return time" is "1/11/22 at 4:00 PM." Guice's traffic stop occurred at noon on January 12, 2022. Thus, she had retained the rental car approximately 20 hours beyond the return date and time. The was no evidence presented that the rental agency had reported the car stolen. The trooper acknowledged that the rental document contained a "Rental Extensions/Changes" phone number and that the document stated that late returns may be subject to extra date charges. The trooper testified that he understood that based on what appeared on the rental document, "it looks like it's an

option that you have to call them and extend the rental." He testified that Guice told him "she was going to renew it, but hadn't done it yet."

**{¶48}** We find that Guice was, like the driver in *Byrd*, a driver in lawful possession or control of a rental car and the mere fact that she had retained the vehicle beyond the rental return date does not defeat her otherwise reasonable expectation of privacy. Like the unauthorized driver in *Byrd*, Guice, as the possessor and driver, would have the expectation of privacy that comes with the right to exclude and would be permitted to exclude third parties from it, such as a carjacker. *Byrd* at 1528-1529.

**{¶49}** Just as "there may be countless innocuous reasons why an unauthorized driver might get behind the wheel of a rental car and drive it," there may be countless innocuous reasons why an authorized driver may decide to continue to drive the rental car beyond the initial return date – the driver may have experienced unexpected delays such that the trip is taking longer than originally planned or the driver may be having an enjoyable vacation and want to extend it out a few more days. *Byrd* at 1529. This may constitute a breach of the rental agreement if the agreement does not provide for an extension and additional fees. But here the rental document provided for extensions and corresponding fees. And, even if it constituted a breach, the Court in *Byrd* explained that contract provisions in rental car agreements concern the allocations of risks and rights between private parties. That sort of private party "allocation has little to do with whether one would have a reasonable expectation of privacy in the rental car if she or he otherwise has lawful possession and control over the car." *Id.*

**{¶50}** Unlike the government allegations in *Byrd* that the driver engaged in the criminal procurement of the rental car and was no more than a car thief, the state made

no allegations that Guice engaged in criminal activity to procure the rental car or that she acted criminally in retaining it. The trial court's decision cites R.C. 2913.41, governing prima facie evidence of purpose to defraud, and the decision states, "Knowingly failing to return hired or rented property as required by the contract of hire or rental, without reasonable excuse for the failure is prima facia evidence of an intent to defraud a livery." However, the trial court's decision makes no findings that Guice criminally defrauded the rental car agency and the state presented no evidence that Guice engaged in criminal fraud or that she failed to return the car "as required by the contract" where, as here, the rental document permits an extension of the return date. The state did not introduce the "rental agreement" into evidence; only a "rental document" showing Guice as an authorized driver and the vehicle's original rental and return dates was placed into evidence at the suppression hearing. Thus, any application of R.C. 2913.41 to Guice's circumstances is purely speculative.

{¶51} We find that the mere fact that an authorized driver in lawful possession or control of a rental car has retained the car beyond the return date does not defeat her otherwise reasonable expectation of privacy. Guice had a reasonable expectation of privacy and Fourth Amendment standing to contest the search.

### 3. Scope of the Search

{¶52} Even though the trial court determined that Guice lacked Fourth Amendment standing, it reviewed the constitutionality of the search and determined that (1) the trooper had reasonable suspicion to initiate a traffic stop; (2) the trooper found the magnetic box within a reasonable time to write a citation or warning; (3) the magnetic box was found during an exterior search of the vehicle and Guice had no reasonable

expectation of privacy in the area outside of the vehicle; (4) Guice consented to the search of the interior of her vehicle (which yielded nothing); and (5) she was not in custody until the magnetic box was found at which point she was informed or her *Miranda* rights; therefore, statements she made before the magnetic box was found were noncustodial and would not be suppressed.

{¶53} Guice does not challenge the trial court's finding that the trooper had reasonable suspicion to initiate a traffic stop, conceding "there was reasonable, articulable suspicion for a traffic stop based upon the crossing the fog line." Guice also concedes that she consented to the interior search of the vehicle and a pat down of her person. However, she contends that there was not a reasonable, articulable suspicion of drug activity that warranted the "more invasive search on the side of the road." And, she contends that there was no justification for the stop lasting to the point where she gave her consent. In other words, Guice contends that the trooper knew within minutes that she was not impaired and there were no signs of contraband, yet he expanded the scope and duration of the search without reasonable suspicion.

{¶54} "The scope and duration of a routine traffic stop 'must be carefully tailored to its underlying justification * * * and last no longer than is necessary to effectuate the purpose of the stop.' " (Omission sic.) *State v. Debrossard*, 4th Dist. Ross No. 13CA3395, 2015-Ohio-1054, ¶ 16, quoting *Florida v. Royer*, 460 U.S. 491, 500, 103 S.Ct. 1319, 75 L.E.2d 229 (1983) (plurality opinion). "Once a driver has been lawfully stopped, an officer may order the driver to get out of the vehicle without any additional justification." *State v. Kilbarger*, 4th Dist. Hocking No. 11CA23, 2012-Ohio-1521, ¶ 16. *See Pennsylvania v. Mimms*, 434 U.S. 106, 111, 98 S.Ct. 330, 54 L.E.2d 331, fn. 6 (1977). " '[T]he officer may

detain the motorist for a period of time sufficient to issue the motorist a citation and to perform routine procedures such as a computer check on the motorist's driver's license, registration and vehicle plates.' " *Debrossard* at ¶ 17, quoting *State v. Aguirre*, 4th Dist. Gallia No. 03CA5, 2003-Ohio-4909, ¶ 36. " ' "In determining if an officer completed these tasks within a reasonable length of time, the court must evaluate the duration of the stop in light of the totality of the circumstances and consider whether the officer diligently conducted the investigation." ' " *Id.*, quoting *Aguirre* at ¶ 36, quoting *State v. Carlson*, 102 Ohio App.3d 585, 598, 657 N.E.2d 591 (9th Dist.1995).

{¶55} "A seizure justified only by a police-observed traffic violation * * * 'become[s] unlawful if it is prolonged beyond the time reasonably required to complete th[e] mission' of issuing a ticket for the violation." (Alterations sic.) *Rodriguez v. United States*, 575 U.S. 348, 135 S.Ct. 1609, 1612, 191 L.Ed.2d 492 (2015), quoting *Illinois v. Caballes*, 543 U.S. 405, 407, 125 S.Ct. 834, 160 L.Ed.2d 842 (2005). Although a police officer "may conduct certain unrelated checks during an otherwise lawful traffic stop * * * he may not do so in a way that prolongs the stop, absent the reasonable suspicion ordinarily demanded to justify detaining an individual." *Id.* at 1615. "An officer may expand the scope of the stop and may continue to detain the vehicle without running afoul of the Fourth Amendment if the officer discovers further facts which give rise to a reasonable suspicion that additional criminal activity is afoot." *State v. Rose*, 4th Dist. Highland No. 06CA5, 2006-Ohio-5292, ¶ 17. "[I]f a law enforcement officer, during a valid investigative stop, ascertains 'reasonably articulable facts giving rise to a suspicion of criminal activity, the officer may then further detain and implement a more in-depth investigation of the

individual.' " *Id.* at ¶ 17, quoting *State v. Robinette*, 80 Ohio St.3d 234, 241, 685 N.E.2d 762 (1997).

{¶56} In discussing the length of the stop, the trial court found that within three minutes of the stop, the trooper had obtained Guice's personal information and contacted dispatch to have the information checked. The trooper testified that he contacted dispatch for information about the validity of her license, outstanding warrants, and a criminal history check. He testified that he does not decide whether to issue a citation or only write up a warning until after he receives information back from dispatch. The dispatcher did not return information to the trooper until approximately 38 minutes into the stop. Therefore, the reasonable time to complete the traffic citation in this instance was 38 minutes because the traffic citation or warning is not issued and the driver is not permitted to leave if the trooper is still waiting to hear back from dispatch about outstanding warrants, etc. Nothing the trooper did during this stop extended the stop beyond the 38 minutes it was going to take to issue the citation or warning for the fog line violation. Everything – the consensual pat down and interior vehicle search, and the exterior search of the vehicle which resulted in the discovery of the magnetic box – was conducted while the trooper was waiting to receive license, warrant and criminal background information from dispatch.

{¶57} We note that 35 minutes seems to be a relatively long time to hear back from dispatch.[2] And, the trial court similarly appeared concerned about why there was a lag in receiving this information, questioning Trooper Lewis directly about it. Trooper Lewis testified that the amount of time it takes for a dispatcher to get information back to

---

[2] The stop commenced at 12:00 p.m., dispatch was contacted at 12:03 p.m., and dispatch responded at 12:38 p.m., making the dispatch turn-around time 35 minutes and the total reasonable stop time 38 minutes.

him varies from dispatcher to dispatcher. The time stamp on the report indicated that the

information was received by dispatch at 12:38 and Trooper Lewis testified that he believes

dispatch would immediately thereafter convey the information to him.

**{¶58}** There is no bright line; the reasonableness of a traffic stop time is evaluated

considering the totality of the circumstances. In most cases a traffic stop takes about 10

to 15 minutes, with about 30 minutes being the outer boundary of reasonableness:

> [O]ur survey of relevant case law reveals that the preparation
> of traffic citations and criminal summonses often requires more than 3 to 4
> minutes. (*Id.* at 45). *See In re $75,000.00 U.S. Currency*, 8th Dist.
> Cuyahoga, 2017-Ohio-9158, 101 N.E.3d 1209, ¶ 27 (noting that some Ohio
> courts have held that "the longest a traffic stop and citation issuance should
> take is approximately 15 minutes"); *State v. Eggleston*, 11th Dist. Trumbull,
> 2015-Ohio-958, 29 N.E.3d 23, ¶ 12 (documenting officer's testimony that "it
> generally takes 8-10 minutes to issue a summons or citation for
> a traffic violation" and "10-15 minutes to complete a summons" when
> a stop results in criminal charges); *State v. Ramos*, 155 Ohio App.3d 396,
> 2003-Ohio-6535, 801 N.E.2d 523, ¶ 5, 17 (2d Dist.) (assuming, with
> reservations, that 30 minutes was a reasonable length of time to process
> citations for a marked-lane violation, an expired license, and a seatbelt
> violation).

*State v. Lawler*, 2020-Ohio-849, 152 N.E.3d 962, ¶ 33 (3rd Dist.).

> Ohio courts have validated stops of varying lengths that are largely fact
> specific, and, as a consequence, have yielded no bright line temporal
> rule. *See e.g., State v. Batchili*, 113 Ohio St.3d 403, 2007-Ohio-2204, 865
> N.E.2d 1282 (nine minutes, but prior to the completion of background
> check); *State v. Bell*, 12th Dist. Preble No. CA2001-06-009, 2002 WL
> 205502 (fourteen minutes, but prior to the response from dispatch); *but see
> State v. Elliott*, 7th Dist. Mahoning No. 11 MA 182, 2012-Ohio-3350, 2012
> WL 3030343, ¶ 25 (30-minute detention is unreasonable where drug dog is
> unavailable so officer conducts field-sobriety test in the interim).

*State v. Chapman*, 2019-Ohio-3339, 131 N.E.3d 1036, ¶ 40 (7th Dist.); *State v. Harper*,

2022-Ohio-4357, 202 N.E.3d 126, ¶ 36 (4th Dist.) (because the trooper was still awaiting

the requested information from dispatch, he had not begun to issue either a verbal or

written warning or citation at the time the canine sniff was conducted; the dog alerted on

the vehicle 14 minutes into the initial stop); *State v. Dukes,* 4th Dist. Scioto No. 16CA3745, 2017-Ohio-7204, ¶ 30 (16 minutes into a traffic stop a trooper was still waiting on information he requested on both the driver and passenger to be returned, which as he explained usually took longer to obtain for out-of-state licenses. Further, because he was still awaiting the requested information, he had not begun to issue either a verbal or written warning or citation. Therefore the dog sniff did not prolong the traffic stop); *State v. Carlson*, 102 Ohio App.3d 585, 599, 657 N.E.2d 591 (9th Dist.1995) (19 minutes had elapsed since the beginning of the stop and when the dog alerted on the vehicle; this was not an unreasonably prolonged traffic stop because the trooper was still waiting on the results of the computer check on an out-of-state license when the dog alerted on the vehicle); *United States v. Roberts,* 492 F.Supp.2d 771, 774 (S.D. Ohio 2005) (more than 30 minutes into traffic stop and the trooper had yet to hear back from dispatch about the validity of a driver's Arizona identification card when the dog alerted on the vehicle; stop was not unconstitutionally prolonged because the purpose of the traffic stop was not completed while trooper awaited information from dispatch).

**{¶59}** The Supreme Court of Ohio has held, "A traffic stop is not unconstitutionally prolonged when permissible background checks have been diligently undertaken and not yet completed at the time a drug dog alerts on the vehicle. There is no showing that the detention was delayed so that the dog could conduct its search, and therefore, there was no constitutional violation." *State v. Batchili,* 113 Ohio St.3d 403, 2007-Ohio-2204, 865 N.E.2d 1282, ¶ 14. Similarly, here Trooper Lewis diligently sought a background check on Guice 3 minutes into the traffic stop and he had not yet received information back from dispatch when he discovered the magnetic box during his exterior search of the vehicle,

25 minutes into the traffic stop. There was no showing that the dispatch information was intentionally delayed so that Trooper Lewis could perform his exterior search of the vehicle. Therefore, as *Batchili* instructs, there was no constitutional violation here.

**{¶60}** Guice's argument that the search was an unconstitutional extension of the time or scope of the stop fails – the stop was not extended because the reasonable length of time for the stop included the time required for a computer check on her driver's license, warrants and criminal history, which in this instance took the dispatcher 35 minutes. Even if no contraband had been found, the traffic stop was going to take 38 minutes in total. Guice's consent in that regard is irrelevant because the duration of the stop lasted no longer than was necessary to effectuate the purpose of the stop.

**{¶61}** Guice also contends that the search of the undercarriage of her vehicle was outside the scope of her consent, "the trooper's search far exceeded the consent given" when he looked under and positioned himself to view the undercarriage of the car. Guice cites no legal authority to support her position that a search of the vehicle's undercarriage goes beyond the scope of a permissible exterior search. While there appears to be no Ohio case law directly on the issue,[3] federal law makes no such distinction. The undercarriage of a car is the exterior portion, and a law enforcement officer may change his bodily position to better see under the vehicle. *United States v. Sanchez*, 955 F.3d 669, 677 (8th Cir. 2020) ("an officer may look at the undercarriage of a vehicle without probable cause" and "officers may crouch and change position when conducting an exterior examination or use a flashlight to artificially illuminate the area being viewed");

---

[3] Case law discussing the expectation of privacy in the undercarriage of a vehicle has been tied inextricably to law enforcement's placement of a GPS tracking device to the undercarriage and the lack of expectation of privacy associated with public road travel. *See State v. Johnson*, 141 Ohio St.3d 136, 2014-Ohio-5021, 22 N.E.3d 1061 (2014).

*United States v. Rascon-Ortiz,* 994 F.2d 749, 754 (10th Cir.1993) ("The undercarriage is part of the car's exterior, and as such, is not afforded a reasonable expectation of privacy. * * * An officer may shift his position to obtain a better vantage point without transforming a visual inspection into a search, even though the agent's purpose is to look for contraband.").

> At the end of the day, and as a practical matter, drawing a line between permissible and impermissible areas of a vehicle's exterior that officers may observe absent physical trespass would seem wholly unworkable. Vehicle configurations vary substantially and officers' inspections of undercarriages will involve varying levels of physical contortion. A distinction that would permit officers to look in windows, crane their necks, stand on their toes, crouch to look in wheel wells, and shine flashlights at night but that would preclude them from looking "too far" under a vehicle is too difficult to articulate. Separating the undercarriage from the rest of the vehicle's exterior necessarily entails defining a subjective dividing line that will vary in each situation and leave officers little guidance as to the limits of their authority.

*United States v. Sanchez*, 955 F.3d 669, 678 (8th Cir. 2020), *cert. denied*, ___U.S. ___, 141 S.Ct. 930, 208 L.Ed.2d 472 (2020). Therefore, the trooper's search of the undercarriage of Guice's rental car was part of its exterior and is not afforded a reasonable expectation of privacy.

### 4. Summary of the Fourth Amendment Protections

**{¶62}** Guice had standing to contest the traffic stop. The mere fact that an authorized driver in lawful possession or control of a rental car has retained the car beyond the return date does not defeat her otherwise reasonable expectation of privacy. The trial court's determination that the scope and duration of the traffic stop lasted no longer than necessary to effectuate the purpose of the stop is supported by competent credible evidence. The trooper diligently sought a computer check on Guice's license, warrants, and criminal history and there was no evidence that the dispatcher intentionally

delayed returning the information so that the trooper could conduct his search of the vehicle. Thus, the traffic stop was not unconstitutionally delayed – the reasonable time for the duration of the stop in this instance, under this specific set of circumstances, was 38 minutes for a traffic stop for a fog line violation. After the magnetic box was discovered, the purpose of the stop changed and a more in-depth investigation was required. Guice concedes that she voluntarily consented to the interior search of the vehicle and the pat down of her body. Her contention that the search of the vehicle's undercarriage went beyond the scope of her consent because it went beyond the scope of an exterior search is not supported by any Ohio case law and we find the federal case law persuasive. An officer may inspect the undercarriage of a vehicle as part of an exterior examination and may change body positions to get a better view.

**{¶63}** We overrule the first assignment of error.

## B. Aggregation of the Drug Quantities

**{¶64}** Guice contends that the four bags of fentanyl mixture contained within the magnetic box were charged in eight separate counts – four trafficking and four possession – but the four bags should have been aggregated into one and should have been charged as one count of trafficking and one count of possession. Guice anticipated the state's argument that such error, if any, was harmless because the judge merged all eight counts for purposes of sentencing. However, she contends that the error was not harmless because "the State intentionally overcharged not only to seek additional prison time if she was convicted, but to overwhelm the jury."

**{¶65}** Guice cites no legal authority for her position, and she cites nothing in the record to support her contention that the jury was overwhelmed. Additionally, Guice failed

to challenge the indictment as multiplicitous prior to trial and therefore has waived it under Crim.R. 12(C)(2) which provides, "The following must be raised before trial: * * * (2) Defenses and objections based on defects in the indictment." *State v. Conn,* 12th Dist. No. CA2014-04-059, 2015-Ohio-1766, ¶ 47 (the defendant waived any claim that his 50–count indictment was defective and multiplicitous by failing to raise alleged defects in the indictment prior to entering his guilty plea). Moreover, even if Guice had not waived this argument, any defects were cured by the trial court's merger of all eight counts at sentencing.

> Even if counts are multiplicitous, "merging them for purposes of sentencing, pursuant to R.C. 2941.25, will cure any threat of double jeopardy." Thus, under Ohio law, "the state may charge a defendant with multiple counts for multiple offenses, based upon the criminal conduct of the defendant." Specifically, R.C. 2941.25, which "codifies the protections of the Double Jeopardy Clause of the United States and Ohio Constitutions, clearly provides that 'where the same conduct by defendant can be construed to constitute two or more allied offenses of similar import*, the indictment or information may contain counts for all such offenses*, but the defendant may be convicted of only one." (Citations omitted, emphasis sic.)

*State v. Gomez*, 2017-Ohio-8832, 100 N.E.3d 1038, ¶ 18 (10th Dist.).

**{¶66}** We overrule the second assignment of error.

C. Insufficiency of the Evidence  - Designing a Vehicle with a Hidden Compartment

**{¶67}** Next Guice challenges her guilty verdict for designing a vehicle with a hidden compartment used to transport a controlled substance on the grounds that the state failed to present sufficient evidence that: (1) the magnetic box met the definition of "hidden compartment" and (2) that she had knowledge of the box's existence. And, if the state failed to present sufficient evidence she had knowledge of its existence, then she argues that all the other convictions must be set aside.

1.  Standard of Review

**{¶68}** "When a court reviews the record for sufficiency, '[t]he relevant inquiry is whether, after viewing the evidence in a light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime proven beyond a reasonable doubt.' " *State v. Maxwell*, 139 Ohio St.3d 12, 2014-Ohio-1019, 9 N.E.3d 930, ¶ 146, quoting *State v. Jenks*, 61 Ohio St.3d 259, 574 N.E.2d 492 (1991), paragraph two of the syllabus; following *Jackson v. Virginia*, 443 U.S. 307, 99 S.Ct. 2781, 61 L.Ed.2d 560 (1979); *State v. Bennington,* 2019-Ohio-4386, 148 N.E.3d 1, ¶ 11 (4th Dist.).

**{¶69}** An appellate court must construe the evidence in a "light most favorable to the prosecution." *State v. Hill*, 75 Ohio St.3d 195, 205, 661 N.E.2d 1068 (1996); *State v. Grant*, 67 Ohio St.3d 465, 477, 620 N.E.2d 50 (1993). Further, "[t]he court must defer to the trier of fact on questions of credibility and the weight assigned to the evidence." *State v. Dillard*, 4th Dist. Meigs No. 13CA9, 2014-Ohio-4974, ¶ 22, citing *State v. Kirkland*, 140 Ohio St.3d 73, 2014-Ohio-1966, 15 N.E.3d 818, ¶ 132; *State v. Lodwick*, 2018-Ohio-3710, 118 N.E.3d 948, ¶ 9 (4th Dist.). Thus, "a reviewing court is not to assess 'whether the state's evidence is to be believed, but whether, if believed, the evidence against a defendant would support a conviction.' " *State v. Davis*, 4th Dist. Ross No. 12CA3336, 2013-Ohio-1504, 2013 WL 1579801, ¶ 12, quoting *State v. Thompkins,*78 Ohio St.3d 380, 390, 678 N.E.2d 541 (1997) (Cook, J., concurring). Rather, a reviewing court will not overturn a conviction on a sufficiency of the evidence claim unless reasonable minds could not reach the conclusion that the trier of fact did. *State v. Tibbetts*, 92 Ohio St.3d 146, 162, 749 N.E.2d 226 (2001); *State v. Treesh*, 90 Ohio St.3d 460, 484, 739 N.E.2d 749 (2001).

**{¶70}** "[A]n offense's elements may be established by direct evidence, circumstantial evidence, or both. Circumstantial and direct evidence are of equal evidentiary value." *State v. Fannon*, 2018-Ohio-5242, 117 N.E.3d 10, ¶ 100 (4th Dist.).

### 2. Elements of R.C. 2923.241(C) – Hidden Compartment

**{¶71}** Guice was convicted of violating R.C. 2923.241(C), which provides:

(C) No person shall knowingly operate, possess, or use a vehicle with a hidden compartment with knowledge that the hidden compartment is used or intended to be used to facilitate the unlawful concealment or transportation of a controlled substance.

"Hidden compartment" is defined in the statute:

(2) "Hidden compartment" means a container, space, or enclosure that conceals, hides, or otherwise prevents the discovery of the contents of the container, space, or enclosure. "Hidden compartment" includes, but is not limited to, any of the following:

(a) False, altered, or modified fuel tanks;

(b) Any original factory equipment on a vehicle that has been modified to conceal, hide, or prevent the discovery of the modified equipment's contents;

(c) Any compartment, space, box, or other closed container that is added or attached to existing compartments, spaces, boxes, or closed containers integrated or attached to a vehicle.

**{¶72}** The state submitted the magnetic box and photographs of the magnetic box as evidence at trial. The magnetic box meets the statutory definition of "hidden compartment" because it is a "container" that "conceals" "the contents of the container" and was a "closed container" "attached to a vehicle." It was an opaque metal box, taped shut, attached magnetically to the undercarriage of the vehicle, and secured with a black zip tie.

**{¶73}** Guice argues that the magnetic box cannot be a "hidden compartment" because Trooper Lewis testified that it was in "plain view." First, we note that Trooper Lewis did not state that the magnetic box was in "plain view." He testified at the suppression hearing (which was not trial testimony) that when he laid down on the ground to look under the vehicle, he could see a zip tie which was not supposed to be there in "plain view." He testified that only after he pulled himself up further under the vehicle was he able to see the box itself, which was tucked up behind the muffler or gas tank area.

**{¶74}** Moreover, despite Guice's assertion, there is nothing in the statute that requires a hidden container to be hidden from "plain view." To the contrary, a hidden compartment can be part of the vehicle's original factory equipment that is in plain view but has been modified to conceal its contents. This means that original factory parts such as a headlight, taillight, bumper section, hubcap – all of which are in plain view – but which have been modified to hide controlled substances, are "hidden compartments" even though these are all parts of the vehicle in plain view.

**{¶75}** Alternatively, she argues that if the magnetic box was "very well hidden" then "it reasonably calls into question whether [she] even knew if its existence." However, the state presented sufficient evidence that Guice had knowledge she was transporting contraband in a hidden compartment when it presented evidence that she was operating the rental car, was coming from a major drug source city, was travelling on a major drug route, had a nonsensical and unbelievable story about where she was going, was driving a car leased to Anton Glenn Miles, a known drug trafficker and someone so close to Guice that she considered him her "brother," and Miles was the first person she spoke to on the phone when she was stopped by law enforcement and repeatedly while in jail.

**{¶76}** We find that after viewing the evidence in a light most favorable to the prosecution, any rational trier of fact could have found that Guice knowingly operated, possessed, or used a vehicle with a hidden compartment with knowledge that the hidden compartment was used or intended to be used to facilitate the unlawful concealment or transportation of a controlled substance. The proof of her knowledge as to the element of this crime is sufficient to meet the element of knowledge for the remaining counts for which she was convicted.

**{¶77}** We overrule the third assignment of error.

D. Manifest Weight of the Evidence – Designing a Vehicle with a Hidden Compartment

**{¶78}** Guice contends that her conviction for designing a vehicle with a hidden compartment is against the manifest weight of the evidence. She succinctly addresses this assignment of error in a single sentence: "For the reasons detailed in the prior assignments of error, Appellant would contend that the triers of fact clearly lost their way and would request that this Court reverse and remand for a new trial."

**{¶79}** App. R. 16(A)(3) requires a separate argument for each assignment of error with a reference to the place in the record where the error is reflected. App.R. 16(A)(7) requires an argument with respect to each assignment of error and the reasons in support of the contentions, with citations to authorities, statutes, and parts of the record on which appellant relies. App.R. 12(A)(2) authorizes us to disregard any assignment of error that an appellant fails to separately argue. However, in the interest of justice, we will consider this argument. *Devol v. Logan,* 4th Dist. Hocking No. 21CA4, 2021-Ohio-4164, fn. 2.

1. Standard of Review – Manifest Weight of the Evidence

**{¶80}** In    determining    whether    a    criminal    conviction    is    against the manifest weight of  the evidence,  we  must  review  the  entire  record,  weigh the evidence and  all  reasonable inferences, consider the credibility of witnesses, and determine whether, in resolving conflicts in the evidence, the trier of fact clearly lost its way and created such a manifest miscarriage of justice that reversal of the conviction is necessary. *State v. Thompkins*, 78 Ohio St.3d 380, 387, 678 N.E.2d 541 (1997); *State v. Hunter*, 131 Ohio St.3d 67, 2011-Ohio-6524, 960 N.E.2d 955, ¶ 119. To satisfy this test, the state must introduce substantial evidence on all the elements of an offense, so that the jury can find guilt beyond a reasonable doubt. *See State v. Eskridge*, 38 Ohio St.3d 56, 526 N.E.2d 304, syllabus; *State v. Harvey*, 4th Dist. Washington No. 21CA3, 2022-Ohio-2319, 2022 WL 2388455, ¶ 24. Because a trier of fact sees and hears the witnesses, appellate courts court will also afford substantial deference to a trier of fact's credibility determinations. *State v. Schroeder*, 2019-Ohio-4136, 147 N.E.3d 1, ¶ 61 (4th Dist.).

2.  Analysis – Designing a Vehicle with a Hidden Compartment

**{¶81}** We previously identified the elements of R.C. 2923.241 in our analysis of Guice's third assignment of error. After we consider the evidence and testimony adduced at trial, which includes the magnetic box, photographs of the magnetic box, the testimony of law enforcement witnesses, and Guice's own testimony, and all reasonable inferences therefrom, witness credibility, and the conflicts in the evidence, we do not believe that the jury clearly lost its way so as to create a manifest miscarriage of justice that Guice's conviction for designing a vehicle with a hidden compartment must be reversed and a new trial ordered. Instead, we believe that the state adduced substantial evidence at trial

to prove all the elements of this offense beyond a reasonable doubt. Thus, we overrule Guice's fourth assignment of error.

E. Statements Concerning Guice's Fifth Amendment Right to Remain Silent

**{¶82}** Guice contends that Trooper Lewis testified that Guice did not deny knowing about the drugs and that this testimony was a comment "on her silence." She concedes that trial counsel did not object to this line of questioning and therefore it must be reviewed under the plain error standard.   Under the plain error standard, "the defendant bears the burden of 'showing that but for a plain or obvious error, the outcome of the proceeding would have been otherwise, and reversal must be necessary to correct a manifest miscarriage of justice.' " *State v. West*, 168 Ohio St.3d 605, 2022-Ohio-1556, 200 N.E.3d 1048, ¶ 22, quoting, *State v. Quarterman*, 140 Ohio St.3d 464, 2014-Ohio-4034, 19 N.E.3d 900, ¶ 16.

**{¶83}** Guice has failed to show – or even argue – that the outcome of the proceeding would have been different. She merely states that it made the exercise of her right to remain silent "suspicious," but she does not state that it affected the outcome of her trial in any respect.

**{¶84}** Furthermore, we find that Guice has incorrectly characterized Trooper Lewis's testimony. Trooper Lewis did not testify about Guice's exercise of her Fifth Amendment right to remain silent, he testified about his offer to have her cooperate and make a controlled delivery and "give information about the source, or help us get it to the destination." Trooper Lewis's testimony was that Guice's response was, "Okay." Then Trooper Lewis testified about how calm Guice's demeanor was and how when he went back to watch her on the police video, "she has very little reaction to any of it." He also

testified that when he explained to her that he believed she was getting paid to run the fentanyl "from Point A to Point B" her only comment was "I don't know what that is." At no point does Trooper Lewis testify concerning Guice's right to remain silent.

{¶85}  We overrule the fifth assignment of error.

## IV.  CONCLUSION

{¶86}  Having overruled the assignments of error, we affirm the trial court's judgment.

JUDGMENT AFFIRMED.

## JUDGMENT ENTRY

It is ordered that the JUDGMENT IS AFFIRMED and that appellant shall pay the costs.

The Court finds there were reasonable grounds for this appeal.

It is ordered that a special mandate issue out of this Court directing the Scioto County Court of Common Pleas to carry this judgment into execution.

IF A STAY OF EXECUTION OF SENTENCE AND RELEASE UPON BAIL HAS BEEN PREVIOUSLY GRANTED BY THE TRIAL COURT OR THIS COURT, it is temporarily continued for a period not to exceed 60 days upon the bail previously posted. The purpose of a continued stay is to allow appellant to file with the Supreme Court of Ohio an application for a stay during the pendency of proceedings in that court. If a stay is continued by this entry, it will terminate at the earlier of the expiration of the 60-day period, or the failure of the appellant to file a notice of appeal with the Supreme Court of Ohio in the 45-day appeal period pursuant to Rule II, Sec. 2 of the Rules of Practice of the Supreme Court of Ohio. Additionally, if the Supreme Court of Ohio dismisses the appeal prior to expiration of 60 days, the stay will terminate as of the date of such dismissal.

A certified copy of this entry shall constitute the mandate pursuant to Rule 27 of the Rules of Appellate Procedure.

Abele, J. & Wilkin, J.: Concur in Judgment and Opinion.


For the Court


BY: _____
        Michael D. Hess, Judge



## NOTICE TO COUNSEL

**Pursuant to Local Rule No. 14, this document constitutes a final judgment entry and the time period for further appeal commences from the date of filing with the clerk.**